# Meyer *v.* Johnston & Stewart.

*Bill in Equity for Foreclosure of Railroad Mortgages.*

1. *Consolidation of railroad companies.*—The additional evidence in this case introduced since the former decision (53 Ala. 237–360), showing the condition and resources of the two Georgia companies which were united with the Alabama and Tennessee Rivers Railroad Company, and the several statutes relating to the organization of the three companies respectively, and authorizing, ratifying, and confirming the consolidation, examined with special reference to the terms of the consolidation, and held not to change the decision formerly announced—that the two Georgia companies were thereby dissolved and merged in the Alabama company, then known as the Alabama and Tennessee Rivers Railroad Company, which was continued in existence, but with enlarged powers and extended franchises, under the name of the Selma, Rome, and Dalton Railroad Company.

2. *Conclusiveness of judicial decisions.*—When a cause is brought before this court a second time, whether on the same, or on a different state of pleadings and proof, the court is required to pronounce the law according to the opinion which it may then entertain, without regard to the former decision (Code, § 3951); but the lower court, to which the cause was remanded, is concluded by the former opinion, and can not again examine the questions then decided, except so far as new evidence may require a modification or change.

[Meyer v. Johnston & Stewart.]

3. *Judicial admission.*—The legal effect of an agreement for the consolidation of several railroad companies, and of the several statutes authorizing and ratifying such consolidation, is a judicial question, which the court must consider and decide; and "in a litigation involving the nature and obligations of an institution like this railroad company [Selma, Rome, and Dalton], and in which the interests concerned, public and private, are so many, various, and important, it is not within the province of counsel, or their clients, to determine by agreement among themselves the relations, rights and duties, which the law makes, consequent upon the acts and transactions set forth and established."

4. *Consolidation of railroad companies; meaning of terms, in statute*—The words *consolidate* and *consolidation,* as used in statutes authorizing and ratifying the union or combination of several railroad corporations into one, have not acquired a recognized judicial construction, which imports that all the companies are dissolved and merged into one new company: on the contrary, the terms are equally applicable to a union of two or more companies in such a way that one of them is continued in existence, though under a new name, and with enlarged powers, while the others are merged in, and absorbed by it; and when the statute authorizes the companies to unite and consolidate "to such an extent, and upon such terms, as may be agreed on by and with the company or companies entering into agreement with them," the character of the consolidation is determined by the stipulations of the agreement.

5. *Same; construction and effect of agreement.*—The articles of agreement between the Alabama and Tennessee Rivers Railroad Company, the Georgia and Alabama Railroad Company, and the Dalton and Jacksonville Railroad Company, entered into on the 8th August, 1866, after reciting that the three companies "are fully authorized to unite together, so as to form one consolidated company, with all the rights, powers, privileges and franchises now belonging to either of said parties;" and that it "is to the interest of each of said parties to unite together into one company, so as to complete, own and use one continuous railroad, from Selma, by way of Rome, to Dalton, under the authority and control of one set of officers,"—contained the following stipulations: 1. That the said companies "be, and they are hereby, united together, and consolidated into one company, with all the rights, powers, privileges and franchises which now belong to either one and all of said companies." 2. That "all the property, real, personal, and mixed, and all franchises now belonging to either one of the parties to this contract, are hereby declared to be the property and franchises of the consolidated company." 3. That "each and every stockholder in either of the said companies, who has paid his or her subscription of stock, shall be a stockholder, to the extent of such payment, in the consolidated company." 4. That "the president and board of directors of the Alabama and Tennessee Rivers Railroad Company shall have and exercise full power and control over all the property of all of said companies, hereby made the property of the consolidated company, and" they "shall cause the railroad which is now completed, from Selma to Blue Mountain, to be extended and completed, from Blue Mountain, by way of Rome, to Dalton, over the best and most practicable route; and, to enable them to do so, and to liquidate the debts of said company, they are hereby authorized to issue bonds, and execute a mortgage or mortgages on any part or all of the property and franchises of all of said companies, including the road-bed and right of way from Selma to Dalton." 5. That "all the debts, contracts, obligations and liabilities, of each of the parties to this contract, are hereby assumed by the consolidated company formed under this contract." 6. That "all acts, contracts and obligations, done and made. or assumed, by and under the authority of the president and directors of the Alabama and Tennessee Rivers Railroad Company, and all such acts, contracts and obligations, hereafter done, made, or assumed, by or under the authority of said president and directors, shall be valid and binding on all of said companies hereby consolidated into one." 7. That, "at the next annual meeting of the stockholders of the Alabama and Tennessee Rivers Railroad Company, all the stockholders of each one of the said companies shall have a right to vote, either in person or by proxy, according to the amount of his or her stock."

8. "Each of the parties to this contract shall ask of the legislatures of their respective States the enactment of a law, giving one name to all of said companies hereby consolidated under authority from each of said States." 9. "The railroad to be extended and constructed under this contract shall be extended, by way of Rome, to Dalton ; at each of which places, suitable buildings are to be erected for the accommodation of the people." 10. "Until a common name shall be lawfully given, under which the franchises of each of said companies shall be united, the Alabama and Tennessee Rivers Railroad Company shall be the active and controlling corporation ; and the organization of the other companies may be continued until then, for the purpose only of preserving and enabling the acting and controlling company to exercise the franchises hereby consolidated with the franchises of said acting and controlling company ; and all the contracts and obligations, which may be entered into or made for said consolidated company, shall be done, until a common name shall be lawfully given as aforesaid, in the name, and in accordance with the franchises of the Alabama and Tennessee Rivers Railroad Company." 11. "No further payment shall be required on subscriptions for stock" in either of the Georgia companies, "but any subscriber to the stock of either of said companies shall have the right, at any time within three years, to pay a part, or all of his subscription, according to the terms thereof ; and such payment shall make the party a stockholder of the consolidated company." *Held,* that the consolidated company under this contract, since known as the Selma, Rome, and Dalton Railroad Company, was not a new corporation, formed by the dissolution and merger of the three original companies, but was the Alabama and Tennessee Rivers Railroad Company, continued in existence under a new name, and with enlarged franchises.

6. *Same; statutes ratifying contract of consolidation.*—Neither the adoption of a new name by a corporation, sanctioned by legislative authority, nor the legislative grant of new powers, changes the identity of the corporation, or creates a new one ; consequently, the acts of the legislatures of Georgia and Alabama, ratifying the consolidation effected by agreement between the Alabama and Tennessee Rivers Railroad Company and the two Georgia companies (the Georgia and Alabama, and the Dalton and Jacksonville), by which it was declared that the consolidation of said three companies, "so as to form one consolidated railroad company for the construction and use of a railroad to be constructed from Blue Mountain, in Alabama, as a continuation of the Alabama and Tennessee Rivers railroad, by way of Rome, to Dalton, in Georgia, be, and the same is hereby, ratified and approved, and the consolidated company, acting by its board of directors, shall be, and is hereby, authorized and empowered to adopt the corporate name and style of the Selma, Rome, and Dalton Railroad Company, and to adopt, as its charter, the charter of the said Alabama and Tennessee Rivers Railroad Company as now existing, with all the amendments thereto,"—simply gave legal recognition and effect to the agreement of the parties, and did not create a new corporation.

7. *Same; subsequent acts and deeds of consolidated company.*—The legal effect of the consolidation of these railroad companies being determined by the provisions of the contract between them, and of the several statutes authorizing and ratifying it, subsequent acts on the part of the board of directors of the consolidated company, or conveyances executed by them, indicating an opinion by them that they were acting for a new corporation, can not affect the identity of the corporation, or the legal rights and liabilities resulting from that identity.

8. *Mortgage of railroad to be constructed, and property to be acquired.*—The mortgage, or deed of trust, executed by the Alabama and Tennessee Rivers Railroad Company, on the 1st July, 1852, conveyed to Lamar and Hallett, as trustees, "the railroad constructed *and to be constructed* by the" said company, "with all the appurtenances thereof, including all lands, houses," &c., "franchises, privileges and rights, and all other property, real and personal, now owned, *or which may be hereafter owned* by the said" company, "and all subscriptions to their capital stock, together with all the tolls, incomes, issues and profits, which may accrue from said railroad, or from any other source whatever ;" and contained full covenants for further assurances and

conveyances, as might be deemed necessary "for the better carrying into effect the objects and purposes of this indenture, and of making more effectual the lien hereby intended to be created, and to embrace the said railroad, *and the future construction thereof*, together with all the other property, means and effects, intended hereby to be mortgaged, as shall hereafter be required, so as to make the security and lien aforesaid at all times as perfect, complete, and effectual as practicable." *Held*, re-affirming the former decision, that this deed conveyed the entire railroad from Selma to the Georgia State line, as completed by the Selma, Rome, and Dalton Railroad Company, notwithstanding the consolidation with other companies, the change of name, and the deflection from the route contemplated when the deed was made.

9. *Same; lands afterwards acquired under grant by Congress*—*Held*, also, as on the former appeal, that although this mortgage purported to convey "*all lands now owned, or which may be hereafter owned by*" the corporation, lands acquired under the grant by Congress in 1856 and the confirmatory statute of 1858 did not pass by it, since the company had no power to accept such a grant when the mortgage was executed, and the acquisition of such lands was not then contemplated.

10. *Same; rolling-stock.*—*Held*, also, as on the former appeal, that all the rolling-stock afterwards acquired by the company, whether under its old or its new name, passed by the mortgage, but subject to any valid liens existing at the time of the acquisition; and that the rolling-stock acquired or used by A. D. Breed, while operating the road under his contract with the company, and transferred by him to the New York Guaranty and Indemnity Company, title thereto never having vested in the railroad company, did not pass.

11. *Payments by receivers of railroad, to connecting roads, for freights collected.*—Payments made by the receivers while operating a railroad, to connecting roads, for freights received belonging to them, "according to a necessary usage in the business of connecting railroads," are properly allowed to them as a credit.

APPEAL from the Chancery Court of Dallas.

Heard before the Hon. CHARLES TURNER.

The bill in this case was filed on the 19th March, 1873, by James B. Johnston and John A. Stewart, as trustees under a mortgage, or deed of trust, executed to them, on the 1st October, 1867, by the Selma, Rome, and Dalton Railroad Company; and prayed the appointment of a receiver or receivers, to take possession of the railroad and operate it, pending the suit, under the orders of the court, a foreclosure of the mortgage, or deed of trust, an adjustment of various conflicting liens and claims, a sale of the property, and general relief. The complainants filed the bill on behalf of themselves, and of all other creditors of the company, against the corporation itself, and against various persons who claimed liens on its property. On appeal to this court at its June term, 1875, numerous errors were assigned by several of the parties in interest; and the chancellor's decree was then reversed, and the cause remanded for further proceedings, as shown by the report of the case—*Meyer v. Johnston and Stewart*, 53 Ala. 237–360—to which reference is made for a full statement of many facts, which it is not necessary to repeat in this place. The principal questions then discussed and decided were— 1st, the legal identity of the Selma, Rome, and Dalton Rail-

road Company and the former Alabama and Tennessee Rivers Railroad Company, which latter company had been united and consolidated with two Georgia corporations, known respectively as the Georgia and Alabama Railroad Company, and the Dalton and Jacksonville Railroad Company; 2d, the operation and effect of the mortgage, or deed of trust, under which the complainants claim'ed, as conveying property and rights of property to which conflicting liens and claims were asserted by the several defendants; and, 3d, the legality and effect of various acts and transactions by the receivers. As the cause is now presented, a more condensed statement of the facts will be sufficient, aided by a reference to the former report.

The Alabama and Tennessee Rivers Railroad Company was incorporated under an act of the General Assembly of Alabama, approved March 4th, 1848, entitled "An act to incorporate the Alabama and Tennessee Rivers Railroad Company;" by which it was provided (section 3), "that said railroad shall extend from some point on the Alabama river, at or near the town of Selma, in the county of Dallas, to some convenient point on the Tennessee and Coosa railroad, and may be and hereby is authorized to connect with the same." Session Acts 1847–8, pp. 265–70. The charter contained no other words or provisions descriptive of the route of the proposed road. There was then no such railroad in existence as that herein designated as the "Tennessee and Coosa railroad;" but an act had been passed by the General Assembly in January, 1844, incorporating a company to build a road which, as described in the charter, "shall extend from some point at or near Gunter's Landing [now Guntersville] on the Tennessee river, to the most eligible point on the Coosa river, between the base of Lookout Mountain and the Ten. Islands Shoals, and shall be located with a view to the extension, at some future day, to some point on the Alabama river."—Session Acts 1843–4, pp. 170–75. The Alabama and Tennessee Rivers Railroad Company immediately organized under its charter, commenced work at Selma, and in 1852 had surveyed and located its road from that place, by way of Blue Mountain and Jacksonville, to Gadsden on the Coosa river, which was supposed to be the objective point of the road from Guntersville; and it was engaged in work at several places along that route. On the 1st July, 1852, said company executed a mortgage, or deed of trust, to G. B. Lamar and W. R. Hallett as trustees, to secure bonds to the amount of $838,000, which it proposed to issue. The following are the material provisions of this deed:

" Whereas the parties of the first part, by virtue and in

pursuance of the powers conferred by their act of incorpora-
tion," &c., "are now engaged in constructing a railroad in
the State of Alabama, on the route authorized by the acts
aforesaid—that is to say, from the Alabama river, at or near
the city of Selma, northward, through portions of the coun-
ties of Dallas, Autauga, Perry, Bibb, Shelby, Talladega,
Benton, and Cherokee, in the direction of the Tennessee river;
the route of which railroad has been surveyed and duly
located by the parties of the first part, or their authorized
board of directors : And whereas the parties of the first part
are desirous of raising, on their credit, the sum of $500,000,
to be applied to the construction of said railroad ; and in the
exercise of their corporate powers, conferred upon them by
the acts of the legislature aforesaid, for this purpose, have
executed, and propose and design to issue and dispose of
their bonds—that is to say, five hundred bonds, for the sum
of $1,000 each ; which bonds are substantially in the form fol-
lowing," &c. "Now, therefore, this indenture witnesseth,
that the said parties of the first part, the better to secure and
provide for the payment of said bonds respectively, with the
interest to accrue thereon, and also to provide for the pay-
ment and security of such other bonds as the party of the
first part may hereafter execute and issue, not exceeding the
sum of $338,450, on the terms and conditions hereinafter
stated, and in consideration of one dollar in hand paid," &c.,
"have granted, conveyed, transferred and set over, and do
by this indenture grant, convey, transfer and set over, to the
parties of the second part, and the survivor of them, in trust
as hereinafter provided, and to his and their successors in the
trust, the railroad constructed and to be constructed by the
parties of the first part, as aforesaid, with all the appurtenan-
ces thereof, including all lands, houses, structures, fixtures
and machinery, piers and wharves, and franchises, privileges
and rights, and all other property, real and personal, now
owned, and which may be hereafter owned by the parties of
the first part ; including, also, all subscriptions to their capital
stock, together with all the tolls, income, issues and profits,
which may accrue from the said railroad, or from any other
source whatever, to the parties of the first part ; and includ-
ing, also, the proceeds and avails of all bonds which may be
issued or disposed of by the parties of the first part. To
have and to hold," &c. "And the parties of the first part, by
this indenture, further covenant and agree to make, execute
and deliver all such other assurances, instruments and con-
veyances, as shall from time to time be necessary, and that
the parties of the second part may reasonably desire, or their
counsel, learned in the law, may reasonably advise, for the

better carrying into effect the objects and purposes of this indenture, and of making the lien hereby intended to be created more effectual, and to embrace the said railroad, and the future construction thereof, together with all the other property, means and effects, intended hereby to be mortgaged, as shall hereafter be required, so as to make the security and lien aforesaid, and by this indenture intended to be created, at all times as perfect, complete, and effectual as practicable." The deed then gives the trustees power to take possession and sell, on default being made in payment of principal or interest on the bonds, and to convey to the purchaser; and there is a further provision for an additional issue of bonds, to the amount of $338,450, after one hundred miles of the road shall have been completed.

Lamar, one of the trustees in this deed, was made a defendant to the bill, Hallett having died before it was filed; and he filed an answer, asserting his rights under the deed, and claiming a prior lien on all the property in controversy; and on his death pending the suit, it was revived in the name of Louis H. Meyer, who was his successor in the trust, and who is now the appellant. He claimed, also, that about 440,000 acres of land passed to the trustees under this deed, being a portion of the public lands which were granted to the State by act of Congress approved June 3d, 1856, and by the State granted to said railroad company, by act approved January 20th, 1858. This statute may be found in the Session Acts of 1859-60, pp. 3-4, having been accidentally omitted from the published laws of 1857-8. By the first section of said act it was declared, "that the lands, franchises, rights, powers and privileges, granted to and conferred upon the State of Alabama" by said act of Congress, "be, and" the same are hereby, accepted, with the restrictions, and upon the terms and conditions contained in the said act of Congress;" and by the second section, "that so much of the lands, rights, interests, franchises, powers and privileges, as are or may be granted and conferred, in pursuance of said act of Congress, to aid in the construction of a railroad from Selma to Gadsden, called and designated in said act of Congress 'the Coosa and Alabama railroad from Selma to Gadsden,' are hereby disposed of, granted to, conferred upon, and vested in the Alabama and Tennessee Rivers Railroad Company."

On the 17th January, 1855, the railroad company executed another mortgage, or deed of trust, to Charles G. Edwards as trustee, to secure other bonds which the company proposed to issue, to the amount of $300,000. This deed purported to convey "one hundred miles of the railroad of said company,

[Meyer v. Johnston & Stewart.]

constructed, commencing at the commencement of the railroad of said company in the city of Selma, with all the appurtenances thereof, including all the lands, houses, structures and fixtures, now owned, or which may be hereafter owned by said company, attached or pertaining to, or which may be attached or pertaining to the said one hundred miles of said railroad, with the franchises of said company, so far as the same may relate or extend to the use, occupation, or ownership of the said first one hundred miles of said railroad, together with all the implements, machinery, and appurtenances now owned by said company, and pertaining to and in and about the work and business of said company, in the said first one hundred miles of said railroad," &c. Edwards, the trustee in this mortgage, was dead when the bill in this case was filed, and no successor in the trust seems to have been appointed. Of the bonds secured by this mortgage, some had been paid and cancelled, and some were alleged to be held by Mrs. H. E. Reynolds, as the administratrix of her deceased husband, Walker Reynolds, and by T. G. Barrett; both of whom were made defendants to the bill, and filed answers, asserting the validity and priority of this mortgage and the first (that to Lamar and Hallett) over the mortgage to the complainants, hereinafter described; and while admitting the priority of the first to the second, insisted that all the property covered by the first, but not covered by the second, should be first subjected by the bondholders under the first, before resorting to the common property covered by both.

On the 25th July, 1865, the said railroad company executed another mortgage, or deed of trust, conveying to W. H. Fellows, as trustee, to secure an alleged indebtedness to Walker Reynolds of about $64,000, the lands donated to the company under the act of Congress above referred to, which were particularly described in an annexed schedule by their numbers, with the additional descriptive words, "being the lands granted in trust to the State of Alabama, to aid in the construction of certain railroads in the State, by act of Congress approved June 3d, 1856." Most of this indebtedness had been paid before the bill was filed, but there was still an unpaid balance of several thousand dollars. Fellows, as trustee, was made a defendant to the bill; and he filed an answer, asserting the priority of his lien, under this mortgage, on all the lands particularly described therein.

All the mortgages above mentioned were executed by the Alabama and Tennessee Rivers Railroad Company, while the deed of trust to the complainants was executed by the Selma, Rome, and Dalton Railroad Company, its successor; and to

understand the legal questions growing out of the conflicting liens of these several mortgages, it is necessary to state the facts connected with the transition or merger of the former company into the latter. Prior to the year 1860, two railroad companies had been incorporated under charters granted by the legislature of Georgia, called the "Georgia and Alabama Railroad Company," and the "Dalton and Jacksonville Railroad Company," respectively; and each of these companies had located its route, and done some work in grading its road-bed, between Dalton and the boundary line between Alabama and Georgia. As to the pecuniary condition, resources, and effective organization of these companies, at the time of their consolidation with the Alabama and Tennessee Rivers Railroad Company, additional evidence was introduced since the reversal of the cause on the former appeal; but it is not necessary to state this evidence in full, the substance of it being stated in the opinion of the court and the briefs of counsel. During the war, the operations of these two companies, and also of the said Alabama company, were greatly impeded and hindered, and their resources greatly impaired, so that, in 1865–6, a union or consolidation of them was proposed. To this end, an act was passed by the General Assembly of Alabama, which was approved on the 20th February, 1866, entitled "An act to amend certain sections of the charter and amended charter of the Alabama and Tennessee Rivers Railroad Company, and to enlarge the powers of said company." The first section of this act set out the second, third, and fourth sections of the original charter, and the sixth section of the amended charter, and amended them as shown in the following sections of the act, namely—

*Section 2.* "That said railroad company, acting by their board of directors, shall have the right and power to lay out, locate, construct and operate a railroad, over such route as may be determined by said board of directors, from such point at or near the town of Jacksonville in this State, to which their present railroad may be completed, to such point on the line separating this State from the State of Georgia, as the said board of directors may determine; and all the provisions of the act aforesaid chartering said company, and of all acts amendatory thereof, so far as the same may be pertinent, shall apply to and form part of the rights and privileges granted in and by this act."

*Sec. 3.* "That said railroad company, acting by their board of directors, shall have the power and right to connect their railroad, or any portion thereof, including the road or roads which may be constructed under the provisions of this act, with the railroad or roads of any other company, in this

State or any other State, on such terms as may be agreed on with the company or companies owning or controlling the road or roads which may be connected with; and may unite and consolidate their railroad, or any portion thereof, including the road or roads which may be constructed as aforesaid, and their stock and franchise, or any portion thereof, with the road or roads, and stock and franchise, or any portion thereof, of any other railroad company or companies, in this or any other State, on such terms as may be agreed on by and with the interested and contracting companies; and the said Alabama and Tennessee Rivers Railroad Company shall have the power to purchase and own the stock and railroad, and appurtenances and franchises, or any portion thereof, of any other company existing in this State or any other State; and to subscribe for and own stock in any other railroad company or companies with whose road the road of this said company, or any part thereof, including the road or roads which may be constructed under the provisions of this act, may become united or connected, on such terms and conditions as may be agreed on by and with the interested and contracting parties; the objects of these provisions being to promote and facilitate, as far as practicable, connections between the railroads and systems of roads in this State and the railroads and systems of roads in adjacent States, constructed and to be constructed. All the rights, powers and privileges, possessed and to be possessed by the said Alabama and Tennessee Rivers Railroad Company, under their act of incorporation and other acts, may and shall be extended and applicable to all railroads and railroad companies which may become connected, or united, or consolidated with the road, or stock, or franchise, in whole or in part, of the said Alabama and Tennessee Rivers Railroad Company, or any road to be constructed by them under the provisions of this act, so far as said rights, powers and privileges may be pertinent or applicable, or can be rendered pertinent or applicable to the companies or roads which may be united or consolidated with, in whole or in part. All contracts or agreements, which may be made by said company with any other railroad company or companies, in pursuance of the provisions of this act, and having in view the objects and purposes of these enactments, as above declared (that is, the promotion of connections between the railroads of this and other States), shall be valid according to the terms thereof, so far as the same shall not be contrary to law."

*Sec. 4.* "That said railroad company shall have power, and they are hereby authorized, so to extend their railroad, in any direction, over such road as their board of directors

[Meyer v. Johnston & Stewart.]

may determine, to connect with any railroad leading to, or in the direction of Gadsden, in the county of Cherokee; and they shall have the same power and authority to extend their railroad southward from the city of Selma, crossing the Alabama river, and construct their extended road southwardly, over such route as may be determined by their board of directors, so as to connect and form a junction, as may be agreed on, with any railroad or roads extending from the direction of Mobile, or from the bay of Pensacola."

*Sec. 5.* "That said railroad company, acting by their board of directors, shall be, and they are hereby, empowered to make all contracts and agreements, not contrary to law, which may be deemed necessary or advantageous in effecting any of the objects contemplated and authorized by this act. They may issue and dispose of their own bonds, to such amount, and on such terms as their board of directors may deem necessary and proper, and may receive, use and dispose of the bonds or obligations of any other company, corporation, or person, and may guaranty the same in such manner and form as said board of directors may agree and prescribe; and as security for the bonds of said company which may be so issued, and the bonds or obligations aforesaid which they may guaranty as authorized, and for all contracts or obligations of said company, which may be entered into in furtherance of any of the objects or purposes contemplated in and authorized by this act, the said company, acting by their board of directors, shall have power to create a lien or liens by mortgage or deed or deeds of trust, in such form, and with such provisions and conditions as their board of directors shall prescribe, on all the property, means and effects, and rights of every kind, or any part thereof, possessed and to be possessed by said company, which shall be valid and binding according to the tenor and effect of such deed. And the said company, acting by their board of directors, shall have power to increase their capital stock, from time to time, to such amount as may be deemed proper, not exceeding the cost of the construction and equipment of the railroads constructed and to be constructed or procured by said company; and may, from time to time, as their board of directors may deem necessary and proper in accomplishing the objects and purposes contemplated and authorized by this act, receive additional subscriptions for stock in their company, and may dispose of stock in their company, for the purposes contemplated and authorized by this act, to such amounts, and on such terms as may be prescribed by, or agreed on with said board of directors."

*Sec. 6.* " That said company shall have power to change

the name of their company, if they shall so desire at any time, for one less inconvenient in length ; and in case of change, the corporate name shall be such as the company shall select, and by resolution of the stockholders in convention declare ; and under the new name which may be selected and adopted, shall continue and exist in all respects, with all rights, privileges, liabilities and obligations, as under their present name."

*Sec.* 7. "That no change in the name of said company, should the name be changed as authorized by this act, nor any thing in this act contained, shall have the effect to release said company from any legal or equitable obligation whatever of said company, but all such obligations shall be and remain in full force after, as before the passage of this act."—Session Acts 1865-6, pp. 340-45.

Laws were also enacted by the legislature of Georgia, amending the charters of the two Georgia companies, and authorizing them to unite with any other railroad company. The act amending the character of the Georgia and Alabama Railroad Company, which was approved February 14th, 1866, contained the following provision : "*Sec.* 7. The said company shall be, and they are hereby, authorized and empowered, acting by their board of directors, to unite and consolidate their road, stock and franchise, with the road, stock and franchise of the Dalton and Jacksonville Railroad Company, and any other railroad of this or any adjacent State, to such extent, and on such terms as may be agreed on, by and with the company or companies entering into agreement with them."—Georgia Laws 1865-6, pp. 210-12. The act conferring similar powers on the Dalton and Jacksonville Railroad Company, which was approved February 23d, 1866, contained a section in the same words, *mutatis mutandis,* and may be found in the same volume, pp. 207-10.

*( Contract for consolidation of companies.)* Acting under the authority conferred by these statutes, the three companies entered into a contract, which, as reduced to writing and signed, dated the 8th August, 1866, contained the following recitals and provisions : " *Whereas,* by acts of the legislatures of the States of Georgia and Alabama, the said parties to this contract and agreement are fully authorized to unite together, so as to form one consolidated company, with all the rights, powers, privileges and franchises now belonging to either of said parties ; *and whereas,* it is to the interest of each one of said parties to unite together into one company, so as to complete, own and use one continuous railroad, from Selma, by way of Rome, to Dalton, under the authority and control of one set of officers ; *therefore,* the said parties do

contract," &c., as follows: 1. That the said companies "be, and they are hereby, united together, and consolidated into one company, with all the rights, powers, privileges and franchises which now belong to either one and all of said companies." 2. That "all the property, real, personal, and mixed, and all franchises now belonging to either one of the parties to this contract, are hereby declared to be the property and franchises of the consolidated company." 3. That "each and every stockholder in either of the said companies, who has paid his or her subscription of stock, shall be a stockholder, to the extent of such payment, in the consolidated company." 4. That "the president and board of directors of the Alabama and Tennessee Rivers Railroad Company shall have and exercise full power and control over all the property of all of said companies, hereby made the property of the consolidated company, and " they " shall cause the railroad which is now completed, from Selma to Blue Mountain, to be extended and completed, from Blue Mountain, by way of Rome, to Dalton, over the best and most practicable route ; and, to enable them to do so, and to liquidate the debts of said company, they are hereby authorized to issue bonds, and execute a mortgage or mortgages on any part or all of the property and franchises of all of said companies, including the road-bed and right of way from Selma to Dalton." 5. That "all the debts, contracts, obligations and liabilities, of each of the parties to this contract, are hereby assumed by the consolidated company formed under this contract." 6. That "all acts, contracts and obligations, done and made, or assumed, by and under the authority of the president and directors of the Alabama and Tennessee Rivers Railroad Company, and all such acts, contracts and obligations, hereafter done, made, or assumed, by or under the authority of said president and directors, shall be valid and binding on all of said companies hereby consolidated into one." 7. That, "at the next annual meeting of the stockholders of the Alabama and Tennessee Rivers Railroad Company, all the stockholders of each one of the said companies shall have a right to vote, either in person or by proxy, according to the amount of his or her stock." 8. "Each of the parties to this contract shall ask of the legislatures of their respective States the enactment of a law, giving one name to all of said companies hereby consolidated under authority from each of said States." 9. "The railroad to be extended and constructed under this contract shall be extended, by way of Rome, to Dalton; at each of which places, suitable buildings are to be erected for the accommodation of the people." 10. "Until a common name shall be lawfully

given, under which the franchises of each of said companies shall be united, the Alabama and Tennessee Rivers Railroad Company shall be the the active and controlling corporation; and the organization of the other companies may be continued until then, for the purpose only of preserving and enabling the acting and controlling company to exercise the franchises hereby consolidated with the franchises of said acting and controlling company; and all the contracts and obligations, which may be entered into or made for said consolidated company, shall be done, until a common name shall be lawfully given as aforesaid, in the name, and in acordance with the franchises of the Alabama and Tennessee Rivers Railroad Company." 11. "No further payment shall be required on subscriptions for stock" in either of the Georgia companies, "but any subscriber to the stock of either of said companies shall have the right, at any time within three years, to pay a part, or all of his subscription, according to the terms thereof; and such payment shall make the party a stockholder of the consolidated company."

*(Statutes ratifying consolidation..)* This contract was approved and ratified by the legislatures of Georgia and Alabama, by statutes approved December 13th, 1866, and February 8th, 1867, respectively. The latter statute is as follows: "*An act* approving the consolidation of the Dalton and Jacksonville Railroad Company with other companies therein named, and to authorize the consolidated company to adopt a name and charter, and to act under the same. *Section 1. Be it enacted,*" &c., "that the consolidation of the Dalton and Jacksonville Railroad Company, and the Georgia and Alabama Railroad Company, of the State of Georgia, with the Alabama and Tennessee Rivers Railroad Company, of this State, as agreed on by and between said companies, so as to form one consolidated railroad company, for the construction and use of a railroad, to be constructed from Blue Mountain, in the State of Alabama, as a continuation of the Alabama and Tennessee Rivers Railroad, by way of Rome, to Dalton in the State of Georgia, be, and the same is hereby, ratified and approved; and the said consolidated company, acting by its board of directors, shall be, and is hereby, authorized and empowered to adopt, as its corporate name and style, the name and style of the Selma, Rome, and Dalton Railroad Company, and to adopt, as its charter, the charter of the Alabama and Tennessee Rivers Railroad Company, as now existing, with its amendments; and under and by said name and style, and charter so authorized, may and shall have, possess, enjoy and exercise all its lawful rights, franchises, powers and privileges, and shall be subject to all lawful liabilities and

[Meyer v. Johnston & Stewart.]

responsibilities incurred or contracted by the said consolidated company; *provided*, always, that nothing in this act shall be so construed as to release either of said companies from any obligation or liability incurred or contracted by them or either of them prior to their said consolidation." Session Acts 1866, p. 379. The statute of Georgia, which had the same title, and was in the same words, with the exception of a few verbal changes, may be found in the Session Acts of Georgia 1866, p. 124.

*(Mortgage to complainants.)* On the 1st October, 1867, the said railroad company, under its new name, executed its mortgage, or deed of trust, to the complainants in this suit, a copy of which was made an exhibit to their bill. This mortgage recites the organization of the three original companies, and the agreement among them, "whereby they became and were lawfully united and consolidated into one company and corporation, existing and to exist, and organized in and under the laws of Georgia and Alabama, and which consolidated company acted under the name and style of the Alabama and Tennessee Rivers Railroad Company, for a certain period of time, and until the adoption of the name next hereinafter mentioned;" the ratification and approval of the consolidation of the companies, by the legislatures of Georgia and Alabama, and the adoption of its new name as authorized, " whereby the party of the first part is now a body corporate and politic, having and using a common corporate seal, and as such has become, and now is vested with, and is entitled to, and become, and was, and is the lawful owner of all the rights, powers, privileges, franchises, railroads, rights of way, materials, rolling-stock, estates, lands, tenements, hereditaments, appurtenances, contracts, claims, chattels and effects, which, before and at the time of said agreement and consolidation, were vested in, or owned or possessed, or could be lawfully claimed or enjoyed in any manner, by all or either of said railroad companies;" also, " that the said companies, with intent to give full and complete effect to the terms of consolidation, have each executed and delivered to the party of the first part deeds of conveyance of all the railroads, franchises, rights, lands and property of said companies, which deeds have been duly recorded;" that the said party of the first part is now the owner of the railroad, franchises, &c., " and also of 375,000 acres, more or less, of the lands granted by the United States to the State of Alabama;" that the several railroad companies, prior to their consolidation, owed debts amounting in the aggregate to $1,900,000, as represented by the outstanding bonds secured by the several mortgages above described, and another mortgage executed by

one of the Georgia companies; and that the Alabama and Tennessee Rivers Railroad Company, "in contemplation of said consolidation, did make and enter into a contract with A. D. Breed, bearing date the 25th May, 1866, providing for the construction and completion of the unfinished portion of said entire railroad, being about one hundred miles in extent, and extending from Blue Mountain, by way of Rome, to Dalton, and for the equipment and operation of the said entire railroad, and to pay for such construction and equipment as therein mentioned and provided;" and "that the said party of the first part, by the agreement and terms of said consolidation, did assume, and is liable to pay all the said debts and liabilities, and to do and perform all things which the said Alabama and Tennessee Rivers Railroad Company, the party of the first part to said contract with A. D. Breed, thereby undertook to do and perform,—the said party of the first part and said Breed having, by a supplemental agreement, dated 20th September, 1867, ratified, confirmed, amended, and reformed said contract;" and that the said railroad company (Selma, Rome, and Dalton), for the purpose of carrying out these agreements, and providing for the payment and security of these debts and liabilities, by its board of directors, had passed resolutions providing for the issue of 5,000 bonds, of $1,000 each, as particularly described in said resolutions, and to be secured by a mortgage, or deed of trust, as follows :—

"Now, therefore, for the purpose of securing equally and alike each and all of the bonds of the said series, executed and to be issued as authorized, and the principal and interest thereof," &c., "the said party of the first part has granted, bargained," &c., "unto the said parties of the second part, their heirs and assigns, and to their successors in the trust herein and hereby created, their respective heirs and assigns, as joint tenants, all the lands, tenements and hereditaments, rights, franchises, property, estates, chattels, and things hereinafter designated and set forth—that is to say, the railroad of the said party of the first part, as well that part which remains to be constructed, extended, and completed, as that part which has been constructed and completed, commencing in the city of Selma, in the county of Dallas, in the State of Alabama, and extending thence, in a northeasterly direction, continuously, through the counties of Dallas, Autauga, Perry, Bibb, Shelby, Talladega, Calhoun, and Cherokee, Alabama, one hundred and seventy-two miles, more or less, to the line of the State of Georgia; thence, in the State of Georgia, through the county of Floyd, by way of Rome, and also through the counties of Gordon and Whitfield, to the town of

Dalton in the county last named, sixty-three miles, more or less, and then terminating at the point or points of connection with the Western and Atlantic railroad, and with the East Tennessee and Georgia railroad; the entire length of the above described railroad being two hundred and thirty-five miles, more or less; of which, one hundred and thirty-five miles, continuously from said city of Selma, are completed and in operation, and the remaining one hundred miles are in process of construction, and to be completed and equipped under a contract with A. D. Breed;" "also, all rights of way, ways, tracks, side-tracks, ties, rails, culverts, stations, depots, water-tanks, engine-houses, machine-shops, structures, rolling-stock, locomotives, cars, tenders, machinery, implements, materials, lands, tenements, and other property, chattels, and things pertaining to said railroad, owned or to be owned by the said party of the first part, or used or acquired, or to be used or acquired by the said party of the first part, in and for the construction, repairs, renewal, operation or management of said railroad, as completed, or to be completed and operated ; and all the chartered rights, privileges and franchises, now possessed, or which shall hereafter be acquired by the party of the first part, pertaining to said railroad, completed and to be completed ; also, the branch railroad," called the "Ashby Branch ;" also, "all and singular the lands granted by the United States to the State of Alabama," "which were conveyed to the said Alabama and Tennessee Rivers Railroad Company, in conformity with said act of Congress," by the law approved January 20th, 1858, "except such portions of said lands as have been heretofore sold, the quantity hereby conveyed being 375,000 acres, more or less ;" also, "all other lands to which the party of the first part may be or become entitled by reason of said grants and acts of Congress and of the legislature of Alabama, or under and by virtue of any other or further or future grants or locations, allowances or confirmations ; together with all and singular the tenements, hereditaments," &c. " *To have and to hold*," to the said trustees, their successors, or assigns, " *in trust*, for the purposes, and upon the conditions, and subject to the provisions hereinafter set forth—to-wit :"

1. Until default should be made in the payment of the principal or interest of any of the bonds, or in the performance of any of the covenants and agreements contained in the deed, the railroad company, it was stipulated, "shall be entitled to have, hold, use and enjoy the said premises, with the appurtenances, and to receive the incomes, rents, tolls, issues and profits, to its own use and benefit." 2. If no default should be made, the deed should become inoperative and

[Meyer v. Johnston & Stewart.]

void. 3. Until default, the railroad company should have power to sell and convey any part of the lands acquired under the grant by Congress; but the sale must be approved by the trustees, and the lien of the deed was not to be discharged until forty per-cent. of the purchase-money was paid; and the money received was to be applied towards the payment of the bonds, or in the construction of the branch railroad, &c. 4. If default should be made in any particular, and should continue for six months, the trustees were authorized to enter and take possession and control of all the property, and to sell the same, or any part thereof, in the city of New York, or in Selma, at their election, and apply the proceeds of sale to the payment of the accrued interest on the bonds, and otherwise as provided in the deed; and they were required to enter and sell, on the request in writing of the holder of any bond or coupon as to which default had been made. 5. The trustees were authorized to appoint agents and attorneys, and to fill vacancies in the "general trusteeship" by and with the concurrence of the board' of directors. 6. "To provide for the payment, satisfaction, or funding of the existing debts and obligations of the said party of the first part, which shall not be otherwise paid or provided for, and more especially the outstanding bonds of the Alabama and Tennessee Rivers Railroad Company, herinbefore mentioned or referred to, which are secured by prior liens on a portion of the premises hereby conveyed, and for the purpose of removing said liens, and for the payment, satisfaction, or funding of other of said debts and liabilities, two thousand (2,000) of the bonds authorized to be made as aforesaid, the highest consecutive numbers of said series, amounting in the whole to $2,000,000, shall be, and they are hereby, *set apart in special trust*, to be retained by the parties of the second part, and shall be delivered by them to Uriel A. Murdock, of the city of New York, as special trustee, who shall use and apply the said bonds as follows— that is to say, sixteen hundred of said bonds shall be held and applied exclusively for the purpose of relieving and discharging the premises hereby conveyed from the aforesaid prior liens of the said first and second mortgages of the Alabama and Tennessee Rivers Railroad Company, now existing thereon; and for this purpose, the said special trustee shall be, and he is hereby, authorized to use and employ the said sixteen hundred bonds, and the proceeds of any sale thereof, so far as may be necessary, in such manner as, in his judgment, shall best secure the objects of this special trust; and he shall have power to sell or exchange the said bonds, or any portion of them, in such manner, and on such terms as he shall deem best adapted to secure said objects. The resi-

[Meyer v. Johnston & Stewart.]

due of said two thousand bonds shall be used and applied by said special trustee, under the instructions of the board of directors of the party of the first part, in the payment, discharge, or funding of the remaining indebtedness of the said party of the first part, in the order which may be prescribed by the said board of directors. In case of a vacancy in the special trusteeship aforesaid, such vacancy may be filled by appointment by the party of the first part, with the approval and concurrence of the parties of the second part." 7. All the bonds not specially set apart under the 6th clause of the deed, and any of them which might remain undisposed of after the accomplishment of the special trust, "shall be faithfully used and applied, from time to time, as may be necessary, in defraying the cost of construction, repairs, completion and equipment of the said railroad, and of the structures, buildings, and improvements pertaining to the same, and expenses incidental thereto." 8. The trustees were not to be accountable for the defaults or acts of each other, nor for the acts of any agent appointed by them in good faith, and were only to be responsible for gross negligence or willful misconduct. 9. The acts of the trustees were declared to be as valid and binding as if done by the party of the first part. The deed contained, also, full covenants of warranty of title, for protection against incumbrances, and for further assurances.

*(Contract with Breed for construction of road.)* The contract between the Alabama and Tennessee Rivers Railroad Company and A. D. Breed, of Cincinnati, Ohio, for the construction of the road, was entered into on the 26th May, 1866. It recites, "that whereas the party of the first part," the said railroad company, "has now a railroad existing and in operation, extending from the city of Selma to Blue Mountain, about one hundred and thirty-five miles, and desires to extend said road, so as to have a continuous line of road from said city of Selma to a point on the East Tennessee and Georgia railroad, at or near the town of Dalton, in Georgia; and desires, in the extension of said road as aforesaid, to adopt and pursue a route passing through the city of Rome, Georgia, if suitable and satisfactory arrangement can be made for that purpose; but, if such suitable and satisfactory arrangement can not be made, then to locate said road over the best and most practicable route without reference to Rome; and if the route through Rome shall be adopted, then the location to be made over the best and most practicable route for a railroad of the first class, having proper regard to grades, alignment, directness, and other rules by which railroads are usually located." By the terms of this contract, the railroad company bound itself "to procure the right of way, and to

locate and lay off the route for said railroad, at its own cost, preparatory to construction, at the earliest day practicable, so that the commencement and continuous prosecution of the work of constructing said road shall not be hindered or delayed;" and Breed bound himself " to construct and complete said proposed railroad over such route as may be adopted by the party of the first part, continuously, from the present terminus at Blue Mountain, to such point at or near the town of Dalton as may be determined as the northern terminus of the road to be constructed, and so to complete said road, in accordance with the stipulations of this agreement, within forty months from the date of this agreement."

The 11th article of the contract is in these words : "11. The parties base their agreement upon the supposition and expectation that the railroad of the party of the first part will be consolidated or united with the railroad authorized to be constructed in the State of Georgia by the Georgia and Alabama Railroad Company, of Rome, Georgia, and the Dalton and Jacksonville Railroad Company, of Dalton, in the same State, or with one of them, so as to constitute a continuous and consolidated line of railway, from the city of Selma, Alabama, to Dalton, Georgia; and that arrangements will be made by the party of the first part, whereby all the chartered rights and privileges of the said Georgia and Alabama Railroad Company, and of the said Dalton and Jacksonville Railroad Company, will be transferred to, and vested in this company; or that an arrangement to this effect will be made with one of said Georgia companies, so that the plan for a consolidated line of road from Selma to Dalton may be carried into effect by the party of the first part ; the said Dalton and Jacksonville Railroad Company, which possesses the right under its charter to construct a road from Dalton to the Alabama State line, in the direction of Jacksonville, Alabama, with power to consolidate with any railroad company of the State, having signified to the party of the first part its perfect willingness to enter into any arrangement with the party of the first part, and desire on the part of the latter to carry into effect the plans and wishes of the party of the first part, for a consolidated and continuous line of railway, from Selma to Dalton, under the ownership and control of the party of the first part."

It was further stipulated, that Breed's compensation, for work done under this contract, should be $31,000 ." for each mile of the railroad, to the extent that the same shall be constructed with the funds or means furnished by himself or his associates," or $25,000 per mile constructed with funds or means furnished by the railroad company, " or with the avails

of the bonds, or proceeds of sales of lands " by the company; " and for the purpose of securing to the party of the second part, his associates and assigns, the payment of all sums to become due to him or them under this agreement, this contract shall be and constitute a lien, as and in the nature of a mortgage, in favor of the party of the second part, his associates and assigns, subject to the conditions and stipulations hereinafter set forth, on the railroad of the said party of the first part, as now existing, with all its appurtenances, and on the railroad to be constructed under the terms of this agreement, including all the rights to be acquired by the party of the first part, on the portion of the railroad, as the same may be constructed, in the State of Georgia, as well as within the State of Alabama, with all the appurtenances to be therewith connected, including the franchise and chartered rights and privileges now possessed by the party of the first part, and the franchise and privileges which may be acquired by the party of the first part, from the said railroad companies of Georgia, or either of them, or from any other source ; and on all lands, and all real and personal property, possessed or hereafter acquired by the party of the first part; and in order to make the lien hereby given, and intended to be given, on the property, rights, and franchises aforesaid, complete and effectual, should any thing more hereafter be deemed essential," a covenant for further assurances was added.   "*Provided* always, that the lien given, or intended to be given and assured by this agreement, or by any instrument which may be hereafter executed by the party of the first part, as provided, shall be subject and subordinate to existing liens, and to liens which may be created for the security of bonds of the party of the first part which may be hereafter issued, to be used in the extinguishment of present mortgage bonds of the party of the first part; or to be exchanged therefor, so far as may be done ; or for the payment of the interest accrued or to accrue on such mortgage bonds ; or to discharge any debt of the party of the first part having a lien on property of the party of the first part; or to raise funds to be used in the construction of the said railroad contracted to be constructed by the party of the second part; or to be used in the payment of sums to become due to the party of the second part, his associates or assigns, under this agreement; and it is agreed that the party of the first part shall have the right to issue such amount of bonds as may be deemed necessary for these purposes, and to secure the same by mortgage, or deed of trust, on such portion of its property, rights, privileges and franchises, possessed or to be acquired, as may be deemed proper by the party of the first part ; which said mortgage,

[Meyer v. Johnston & Stewart.]

or deed of trust, shall constitute a lien superior to the lien given or assured by the terms of this agreement to the party of the second part, his associates, or assigns."

"17. As a part of this agreement, and connected with the preceding, the party of the second part agrees to take or lease, on the terms hereinafter set forth, the railroad of the party of the first part as now existing, and to be constructed under this agreement, with all its locomotives, cars, machinery, tools and implements of every kind," &c.; "all of which shall be turned over and delivered to the party of the second part, or his authorized agent, as soon as practicable after the execution of this agreement by the parties; and from the time of the delivery, the payment of rent under this agreement shall forthwith commence. As soon as practicable after the delivery of the leased property, a careful schedule thereof shall be taken, setting forth a correct list and description ·of the property to pass under the lease, with the present estimated value of each locomotive, car," &c. "18. On the termination of the lease, another schedule shall be made, in the same manner as the first, setting forth correctly all the leased property returned, except that, in both schedules, no statement will be made in relation to the depot-houses, platforms, station-houses, and other buildings, but only of the railroad, locomotives, cars, machinery, implements, and like things; and in the second schedule, all property which may be returned, of like kind with that leased and set forth in the first .schedule, will be listed and valued, and the existing railroad, which alone will be referred to in either schedule, will be described and valued; the valuation in both schedules to be based on the actual condition of the road-bed," &c., "showing the actual state and condition thereof, in contrast with the same as set forth in the first schedule; the rules · and principles of valuation to be fair and equitable, and the same in regard to both schedules. After the completion of the second schedule, the real difference in the value of the property, as listed and valued in the two schedules, shall be ascertained. If the valuation under the first schedule shall be greater than that under the second, the difference shall be charged against the party of the second part; but, if the valuation under the second schedule shall be greater than that under the first, then the difference shall be due to the party of the second part, and constitute a debt against the party of the first part; to which shall be added interest, on all locomotives and cars, or on the value thereof, from the time brought upon the road, if brought upon the road within six months of the termination of this lease; and the amount which may thus be due the party of the second part, will bear

interest until paid." The 20th article of the agreement further provided, " that the party of the second part shall have the right, pending said lease, to make such additions to the locomotives, cars and machinery, tools, implements, and appurtenances, as may be necessary and required from time to time for the business of the road ; which shall be taken into account, in the schedule of leased property above provided for on the termination of the lease." Another article made special provision for the payment of the rent as stipulated; another provided that Breed should be entitled to retain the possession of the road, with its appurtenances, until the company's debt to him was reduced below $500,000 ; and the others are not material as the case is now presented.

On the 31st May, 1866, the road, with all its rolling-stock, &c., was delivered to Breed under this contract; and he proceeded to repair the road between Selma and Blue Mountain. On the 20th September, 1867, this contract was, by agreement, between Breed and the Selma, Rome, and Dalton company, amended in several particulars, ratified, confirmed, and approved. In the contract as amended it is recited, that the original contract with Breed was made " in contemplation of the consolidation and union of" said railroad companies, " and that said contract should be assumed, on behalf of said Alabama and Tennessee Rivers Railroad Company, by the consolidated company." The contract stipulated—1st, that the mortgage to be executed by the railroad company, and which was executed to the complainants as above shown, " shall be a lien and incumbrance on all the property therein conveyed, or intended so to be, prior to the lien of said contract of May 25th, 1866, and of this contract; and this contract shall be subject to all the provisions and stipulations contained in said contract." 2. " There being some doubt whether, under the said contract of May 25th, 1866, the party of the first part would be authorized to use any part of the proceeds of the $5,000,000 of bonds proposed to be issued, in the payment of the debts of the company not secured by mortgage or other lien," it was stipulated that such appropriation of the bonds might be made, to the extent of $2,000,000. It was stipulated, also, that Breed should receive $3,000,000 of the bonds which the company proposed to issue; and there were other provisions, as to the payment of rent, &c., which require no special notice.

Breed completed the railroad under this contract, and delivered it to the railroad company in October, 1870, with the rolling-stock, &c., then on it; and he received from the company $3,000,000 of its bonds, as stipulated. A portion of the

rolling-stock used by Breed in operating the road, valued at about $175,000, was transferred by him, in August, or September, 1870, to the New York Guaranty and Indemnity Company, to whom he was indebted; and it was afterwards rented from that company by the railroad company. The questions now raised as to this rolling-stock will be readily understood from the opinion of the court and the briefs of counsel.

On final hearing, on pleadings and proof, the chancellor held that the consolidated company was a new corporation, and rendered a decree, declaring, 1st, that the mortgage to Lamar and Hallett created a first and prior lien on all the rolling-stock and other personal property belonging to the Alabama and Tennessee Rivers Railroad Company on the day of its date, "and upon all that portion of the railroad and its appurtenances belonging to the Selma, Rome, and Dalton Railroad Company, beginning at Selma, and extending northwardly and continuously to Jacksonville in Calhoun county, Alabama, a distance of about 145 miles, including all depots," &c., "and all the real estate appurtenant to and used in connection with that portion of said road, and the right of way and chartered privileges and corporate franchises included in said mortgage; but that said mortgage does not create any lien on the branch railway and its appurtenances, known as the 'Ashby Branch,' nor upon the lands known as the public lands granted by Congress to the State of Alabama for the use and benefit of the Alabama and Tennessee Rivers Railroad Company, and subsequently confirmed by act of Congress to the Selma, Rome, and Dalton Railroad Company." 2. That the mortgage to Edwards "is a second lien upon that portion of said railroad and its appurtenances, which extends from the southern terminus in the city of Selma northwardly to the one hundred mile post; and that, if the proceeds arising from the sale of the said 145 miles of said railroad and its appurtenances, and the sale of the rolling-stock and other personal property, upon which the said first mortgage is held to be a first lien, shall be more than sufficient to pay the bonds secured by the first mortgage, the excess shall be applied to the satisfaction of the debts secured by the said second mortgage." 3. That the mortgage to Fellows "is a first and prior lien upon the unsold lands of the Selma, Rome, and Dalton Railroad Company, known as the public lands aforesaid." 4. That the mortgage to Johnston and Stewart, as trustees, "is a lien upon all the property, real and personal, of every kind and description whatsoever, belonging to the Selma, Rome, and Dalton Railroad Company; that it is a first and prior lien upon the portion of said rail-

[Meyer v. Johnston & Stewart.]

road and its appurtenances, beginning at a point in Jackson-
ville, Calhoun county, Alabama, and extending northwardly
and continuously to and including the northern terminus of
said road in the town of Dalton, Georgia, and upon the
branch railway known as the 'Ashby Branch;' that it is a lien
upon said public lands, subject only to the lien of the mort-
gage to Fellows, trustee; that it is a lien upon the said 145
miles of said railroad, subject to the lien of said first mortgage
of the Alabama and Tennessee Rivers Railroad Company, and
subject also to the lien of said second mortgage of said com-
pany; that it is a lien, also, upon the rolling-stock and other
personal property owned by the Alabama and Tennessee Riv-
ers Railroad Company on the 8th August, 1866, subject only
to the lien of said first mortgage of said company, and subject
also to the equity between said first and second mortgages
as hereinabove decreed; and that said mortgage to complain-
ants creates a first and prior lien upon all other property,
real and personal, of the Selma, Rome, and Dalton Railroad
Company, not hereinbefore declared to be subject to the prior
liens of other mortgages."

The decree then proceeds thus:   "And it appearing from
a report of the register, read and filed on the 14th February,
1877, modified and approved by order of the court made and
entered on the 4th March, 1877, that it was necessary for the
conservation of the railroad and its appurtenances in Alabama
that the receivers, heretofore appointed in this cause, should
purchase what is known as the 'Breed Rolling Stock,' and
the 'Equipment Associate Rolling Stock'; and that in said
purchase it was necessary, and the receivers did issue certifi-
cates of indebtedness of the value, at ninety cents on the dol-
lar, of $303,080; and it appearing also from said report and
the order of the court that the said receivers, for the purpose
of making necessary repairs and improvements upon the rail-
road in Alabama, and to pay what was due to connecting
roads, issued like certificates of indebtedness, to the amount,
at ninety cents on the dollar, of $67,950, and it having been
provided in said certificates of indebtedness that the same
should be a lien upon the rolling-stock purchased by said
receivers; it is now, therefore, hereby adjudged, ordered, and
decreed, that the said certificates above named, to the amount
of principal and interest, to be ascertained as hereinafter pro-
vided, at which they were used in payment for said rolling-
stock, or were sold for cash, with interest from the time they
were issued upon such sum, are a first or prior lien or charge
upon said 'Breed Rolling Stock,' and 'Equipment Associate
Rolling Stock.'"   A similar decree was rendered in reference
to fifteen locomotive engines, called the "Welsh Locomotives,"

[Meyer v. Johnston & Stewart.]

which were ordered to be sold separate from the other rolling-stock. An account was ordered to be stated by the register, of all the debts and claims against the Alabama and Tennessee Rivers Railroad Company, and also of the Selma, Rome, and Dalton Railroad Company; and a sale was ordered to be made of the railroad, with all its property, &c., to satisfy the claims according to the liens declared by the decree.

The appeal is sued out "by L. H. Meyer, who here makes fifty-nine assignments of error, founded on the final decree, the various interlocutory decrees since the remandment of the cause, and all the matters which were assigned as error on the former appeal. Mrs. Reynolds also joins in all the assignments of error, except the 48th, which was founded on that part of the final decree which allowed the prior lien of the mortgage to Fellows on the public lands.

PETTUS, DAWSON & TILLMAN, for L. H. Meyer, appellant. 1. As to the legal effect of the contract for the consolidation of the three railroad companies, whether considered by itself, or in connection with the several statutes authorizing and ratifying it, the appellant relies on the former opinion of this court, and the authorities cited for the appellant on the former appeal.—*Railroad Company v. Harris*, 12 Wallace, 65. "The cases of *Clearwater v. Meredith* (1 Wallace, 40), and *McMahon v. Morrison* (16 Indiana, 172), cited for appellees, have been pronounced mere *dicta* on this point, by the Supreme Court of the United States, in the recent case of *Central Railroad and Banking Company v. Georgia*, 8 Otto, 359. On the former appeal, the contract between the companies, and the several statutes relating thereto, were in evidence, and were fully considered by the court; and it is submitted that there is nothing in either the pleadings or proof under the amended bill, which can change or affect the decision of the legal question as before presented. Under the amended bill, and the evidence adduced in support of it, the main facts are not varied, but are only elaborated, and stated more in detail, leaving the general equities unchanged.

2. But, whether the legal effect of the consolidation of the several companies be, as the chancellor held, a dissolution of all the old companies, and the formation of a new company, or, as the appellant insists, merely a continuance of the old Alabama company under a new name, and with enlarged powers—whether the old company is to be regarded as dead, or as still living—the present company is fully bound by all the contracts, covenants and obligations of the old Alabama company. An express stipulation in the contract was, "that all the debts, contracts, obligations and liabilities of each one

of the parties to this contract, are hereby assumed by the consolidated company formed under this agreement." By the terms of the contract, then, the new company acquired all the property and rights of the old company, and, at the same time, assumed and agreed to pay all its debts. The principle is well settled, that when property is transferred by one person to another, and the latter promises, in consideration of the transfer, to pay a debt or debts which the transferror owes to third persons, a trust, or equitable lien on the property, is thereby created in favor of such creditors, for the payment of their debts; and this lien will prevail over all other liens or rights subsequently acquired, except as against a *bona fide* purchaser for value without notice.—2 Story's Equity, §§ 1257–59; 2 Spence's Equity, 287; Perry on Trusts, §§ 241, 594; *Hallett v. Hallett*, 2 Paige, 15; *Harris v. Fly*, 7 Paige, 421; *Spofford v. Manning*, 6 Paige, 383; *Dodge v. Manning*, 11 Paige, 334; *Gregory v. Williams*, 3 Mer. 382; *Sheppard v. Sheppard*, 7 John. Ch. 57; *Clopton v. Sledge*, 6 Ala. 589; *Hobson v. Andrews*, 23 Ala. 219. Here, there is no pretense that the complainants are creditors or purchasers without notice; for the contract between the companies, and the existence, nature and amount of the debts of the old Alabama company, are recited in the complainants' mortgage.—*Branch & Sons v. M. & W. P. Railroad Company*, 59 Ala. 139.

3. Again, a corporation holds its property, first, in trust for its creditors, and then for its stockholders; and when it is dissolved, *eo instanti*, all of its creditors have a lien on all of its property, real, personal, or mixed; which lien is superior to all liens or equities subsequently acquired by any other person, except a *bona fide* creditor or purchaser for value without notice.—*Mumma v. Potomac Company*, 8 Peters, 281; *Dummer v. Wood*, 3 Mason, 308; Perry on Trusts, §§ 241-2; 2 Story's Equity, § 1252; Angell & Ames on Corporations, §§ 59J, 600, notes; *Huckabee v. Smith*, 53 Ala. 191; *Bank of St. Mary's v. St. John*, 25 Ala. 566. If, then, the old Alabama company was dissolved by its consolidation with the Georgia companies, its creditors still have a lien on all its property, superior to all other liens or equities subsequently acquired, except by a *bona fide* creditor or purchaser for value without notice. The bill in this case, it must be remembered, is a general creditors' bill, and seeks to marshal all the assets of an insolvent corporation, and to settle liens and priorities.

4. The court is asked to reconsider its former ruling, that the public lands, held by the railroad company under the grant from the United States and the State, did not pass by the mortgage to Lamar and Hallett as trustees. When that mortgage was executed, the railroad company had authority,

[Meyer v. Johnston & Stewart.]

by the 6th section of its amended charter, " to pledge, in such form as the board of directors may think proper, by resolution, mortgage, or deed of trust, or otherwise, all the means, property and effects of the said company; and any pledge so made by said board of directors," it was declared, " whether by resolution, or mortgage, or deed of trust, or other form of contract, shall be valid and effectual to all intents and purposes."—Session Acts 1851-2, p. 344. This is a very broad power; and the mortgage· to Lamar and Hallett, which was executed under this power, employs words equally broad and comprehensive. It purports to grant and convey ".the railroad constructed, and to be constructed," " with all appurtenances thereof, including all lands, houses, structures, fixtures, and machinery, piers and wharves, and franchises, privileges and rights, and all other property, real and personal, now owned, and which may hereafter be owned by " the grantor; " together with all the tolls, incomes, issues and profits, which may accrue from the said railroad, or from any other source whatsoever," &c. This is the " form of contract " which the directors thought proper to adopt for the security of the bonds, under the powers conferred upon them; and the language can not be construed otherwise than as showing· an intention to include all lands afterwards acquired by the company, without regard to the manner of its acquisition, or the source from which it was acquired. This being the intention of the parties, and the language used being broad enough to embrace the public lands afterwards acquired, those lands must pass by the mortgage, unless some principle of law prevents the deed from operating according to the intention of the parties.

5. The doctrine of· *Ultra Vires* is invoked, to defeat this operation of the mortgage. To say that an act of a corporation is *ultra vires*, is simply to say that it is contrary to the policy of the State. But the grant of lands afterwards acquired, not appurtenant to the road, was not *ultra vires* when this mortgage was executed; and if it was, the State has since validated the grant in that particular. The 4th section of the original charter of the company declares, that the company " shall be capable in law of purchasing, holding, leasing, selling and conveying property, real, personal, and mixed, so far as shall be necessary for the purposes of this incorporation."—Session Acts 1847-8, p. 266. This power is entirely distinct from that given by the 10th section, which relates to the right ·of way and the construction of the road; and while the 10th section was afterwards amended, so as to remove doubts·which had arisen as to its operation and construction, the 4th section was left in full force, without limita-

[Meyer v. Johnston & Stewart.]

tion or qualification. This section, fairly construed, author-
ized the company to accept a grant of lands from the State,
or from the United States, as well as to acquire them by pur-
chase, or in any other way. That these lands passed by the
conveyance to Lamar and Hallett, see *Whitehead v. Vineyard,*
50 Mo. 30; *Wilson v. Boyce,* 2 Otto, 325.

6. The grant of these lands to the company by the State
carried with it, by necessary implication, the power to accept
the grant; and the State has, by statutes since enacted, vali-
dated this mortgage, and declared that it shall have operation
and effect according to its terms.—Session Acts 1859–60, p.
223; *Ib.* 1865–6, p. 340. That these laws are a legitimate
exercise of legislative power, and not obnoxious to any con-
stitutional provision, see Cooley's Const. Lim. 369-78; 2 Red-
field on Railways, 516, 692; *Hall v. Railway Company,* cited
in 2 Redf. Railways, 517; *Shaw v. Norfolk R. R. Co.,* 5 Gray,
Mass. 179; *Chapin v. Vermont R. R. Co.,* 8 Gray, 577; *Mil-
ler v. R. & W. R. R. Co.,* 36 Vermont, 452; *Bridgeport v.
Housatonic R. R. Co.,* 15 Conn. 495; *Galveston Railway v.
Cowdrey,* 11 Wallace, 459; 21 Howard, 425.

7. The mortgage to Lamar and Hallett contains ample
covenants for further assurances, and full effect must be
accorded to them. A mortgage of property to be afterwards
acquired, whether it be real or personal, will be treated in
equity as a binding contract, attaching to the property when
acquired. This is on the principle, which is one of the fun-
damental maxims of a court of equity, that the court looks to
the substance rather than the form of things, and considers
that as actually done which it would decree to be done, or
which was agreed to be done.—Fonb. Eq. § 9, mar. p. 419;
4 Bouvier's Inst. § 3729; 1 Story's Equity, § 57; *Railroad
Company v. Woelper,* 64 Penn. St. R. 366; *Craig v. Leslie,*
3 Wheaton, 573. This principle would be applied, if there had
been no covenant for further assurance, and if no further
assurance had been given. But the contract with Breed,
which expressly makes his lien "subject and subordinate to
existing liens," which are clearly indicated to be the "mort-
gage bonds of the party of the first part," "must be deemed
a sufficient act of new or further assurance."—*Seymour v. C.
& N. F. Railroad Company,* 25 Barbour, 307–8. Under a
covenant for further assurance, a subsequent title enures to
the grantee, as well as under a covenant of warranty of title.
*Phelps v. Kellogg,* 15 Illinois, 137; *Fairbanks v. Williamson,*
1 Greenl. 96; *Bennett v. Waller,* 23 Illinois, 97; Herman on
Estoppel, §§ 260, 278, 269.

8. The mortgage to Lamar and Hallett covers all of the
railroad in this State, with its branches, and all the real prop-

erty appurtenant to the railroad, all the franchises, all the lands acquired under the grant by Congress, and all other property which the Alabama and Tennessee Rivers Railroad Company ever owned, including all the rolling-stock and other personal property put on the road by Breed under his contract with the company. In other words, it covers all the property and rights which it professes to cover. This is the legal effect and operation of the deed, " construed by its four corners." Words of larger import, or more comprehensive meaning, could not well have been found, than are employed in this deed ; and full effect must be accorded to them, unless some principle of law will be thereby violated.—*Pierce v. Emery*, 32 N. H. 484 ; *Galveston Railroad v. Cowdrey*, 11 Wallace, 475 ; *Pinnock v. Coe*, 23 Howard, 128 ; *Dunham v. Railway Company*, 1 Wallace, 266 ; *Miller v. Railway Company*, 36 Vermont, 294 ; *Morrill v. Noyes*, 56 Maine, 471 ; *Willink v. Morris Canal*, 3 Green's Ch. 402 ; *Mitchell v. Winslow*, 2 Story, 629 ; *Pierce v. Milwaukie R. R. Co.*, 24 Wisc. 551 ; *Whitehead v. Vineyard*, 50 Mo. 30. Not only the railroad company, the grantor in the deed, but " all persons claiming under and in privity with it, are estopped from asserting that the deed does not cover all the property and rights which it professes to cover."— *Galveston Railroad v. Cowdrey*, 11 Wallace, 480 ; *Douglass v. Scott*, 5 Ohio, 198 ; *Bean v. Welsh*, 17 Ala. 770 ; Herman on Estoppel, § 269 ; *Dewolf v. Hayden*, 24 Illinois, 525 ; *Garrett v. Lyle*, 27 Ala. 586.

9. On the former appeal, the orders of the chancellor authorizing the receivers to purchase the " Breed rolling-stock," and confirming their purchase, were held to be not binding on Meyer, who was not before the court when those orders were made ; and they were opened to permit inquiries to be made, as to the ownership of this rolling-stock, its value, and the liens on it.—53 Ala. 354. The history of this rolling-stock is clearly stated in the master's report, in which he reported, on the facts proved before him, that the mortgage to Meyer was a first lien on it, and that the complainants' mortgage was also a lien on it, superior to any claim or title of the New York Guaranty and Indemnity Company, and that the receiver ought not to have bought it. The chancellor set aside the report of the master, and sustained the claim of the said New York company, and the purchase by the receiver ; and therein, it is insisted, the chancellor erred, to the prejudice of this appellant. This rolling-stock was bought by Breed, and placed on the road while he was operating it under his lease ; and some of it was built by him at the company's shops in Selma, out of new and old materials. By the terms of the lease, he acquired the possession of all the

rolling-stock belonging to the railroad company, with all its other personal property; and on all this property, as well as that brought on the road by Breed, the mortgage to Lamar and Hallett was a first lien, and Breed had only a subordinate lien. So far as the record shows, Breed paid in full for all the rolling-stock brought on the road by him; and it is not pretended that any person had reserved any lien on it. The only question, then, is as to the condition of the liens on this property while it was on the road, and in the possession of Breed. The appellant contends—1st, that it then belonged to the company; 2d, that the mortgage to Lamar and Hallett attached to it, as fast as it was brought on the road, as a first lien; 3d, that Breed had a lien on it also, but "subject and subordinate to" the first mortgage; and, 4th, that the complainants also had a lien on it, which was superior to Breed's, by virtue of the 12th article of the contract between him and the railroad company. The instruments creating these liens were all duly recorded, and operated as notice to all the world; and no third person could acquire a lien which would override them. This being the condition of things, and the company being insolvent, Breed sold the rolling-stock, with the consent of the company, to the New York Guaranty and Indemnity Company; and the company, at the same time, bought it back, and agreed to pay rent for it; and the stock being thus on the road, and large payments having been made on it, when the receivers were appointed, the chancellor authorized them to buy it, and to pay for it with their certificates. If these facts do not show a design and intention to defraud the mortgage creditors, that is their necessary effect; and the court will not suffer these lawful liens to be thus defeated.

10. The chancellor authorized the receivers to pay certain balances to connecting railroads, amounting to $6,800; and under this order, the receivers paid about $8,650, in their certificates. But, this order having been made in vacation, and without notice, this court held the adverse parties not concluded by it; and added, "in this inquiry, and also in that respecting the receivers' certificates, the burden of proof must be as much on the receivers as if said orders had not been made." No sufficient reason is shown for allowing the receivers a credit for these payments. It must be remembered that these "balances" were no part of the expenses or other debts contracted by the receivers. They were a part of the general floating debt, unsecured by any lien; and the chancellor could not authorize their payment out of the mortgage property, in preference to the debts secured by the mortgages; for this would be to impair the obligation of contracts, and

deprive a person of his property without due process of law.
*Green v. Biddle*, 8 Wheaton, 75 ; *Bronson v. Kinzie*, 1 Howard,
316 ; *Gantly's Lessee v. Ewing*, 3 Howard, 716 ; *Railroad Co.
v. Man. Co.*, 16 Wallace, 318 ; *Van Hoffman v. Quincy*, 4 Wallace, 553 ; 3 Wallace, Jr., C. C. Rep. 214 ; 2 Kent's Com. 13;
*Taylor v. Porter*, 4 Hill, N. Y. 147 ; *Hoke v. Henderson*, 4 Dev.
N. C. 15.

H. A. HARALSON, for Mrs. Reynolds, and for the second-
mortgage creditors.—1. The mortgage to Fellows, as trustee,
to secure the debt to Walker Reynolds, is a first lien on the
lands acquired under the act of Congress ; and the proceeds
of the sale of those lands must be first applied to the satis-
faction of the balance still due on that debt.    These lands
did not pass by the mortgage to Lamar and Hallett, because
they were not within the contemplation of the parties, and
because the railroad company had no capacity to acquire
them when that mortgage was executed.   On these points,
these appellants rely on the former decision of this court.
53 Ala. 331–32.   As against this mortgage, the covenant for
further assurances, contained in the first mortgage, has no
effect, since there had been no attempt to perform or execute
it when this mortgage was given.

2. The mortgage to Edwards, as trustee, creates a lien on
the first one hundred miles of the railroad, and upon all the
lands, houses, fixtures and structures, attached or pertaining
to said one hundred miles, whether then owned, or afterwards
acquired, superior to the lien of the complainants' mortgage,
and second only to that of the mortgage to Lamar and Hal-
lett, the superiority of which is admitted.    But, as against
the lien of the mortgage to Lamar and Hallett, the second-
mortgage creditors invoke this general principle, always
applied in equity when assets or securities are to be mar-
shalled under a bill like this :   If one party has a lien on or
interest in two funds for the security of a debt, and another
party has a lien on or interest in only one of those funds for
the security of another debt, a court of equity will, at the
instance of the latter, compel the former creditor to resort to
his separate fund in the first instance, before resorting to the
fund on which both have a lien, when that course is neces-
sary to procure satisfaction of the claims of both parties, and
will not operate to the prejudice of the creditor having a lien
on both funds.—Story's Equity, vol. 1, §§ 633–45 ; *Chap-
man v. Hamilton*, 19 Ala. 121 , *Nelson & Hatch v. Dunn*, 15
Ala. 501 ; Eden on Injunctions, ch. 2, pp. 38, 40, 62.

3. But the bondholders under the mortgage to Edwards
are not confined to the lien of their mortgage on the first one

[Meyer v. Johnston & Stewart.]

hundred miles of the railroad. Their mortgage contains full covenants for further assurance, and the contract with Breed is made "subject and subordinate" to it; which contract was assumed by the consolidated company, and binds that company to pay their debts equally with those covered by the mortgage to Lamar and Hallett.

(As to the effect of the consolidation of the several railroad companies, the receivers' certificates, the payment of the balances to connecting roads, the "Breed rolling-stock," &c., Mr. Haralson pursued the same line of argument as in the brief for the appellant Meyer, and cited the same authorities.)

MORGAN, LAPSLEY & NELSON, for the appellees, on questions affecting the receivers.—As to the receivers in this case, there is no final decree, from which an appeal can be prosecuted for or against them. They are only incidentally affected by the decree rendered by the chancellor : neither the pleadings in the cause, nor any motion or petition as against them, presents any issue of law or fact, upon which any decree can be rendered to charge or discharge them in respect to any misconduct or malversation on their part. The "Breed rolling-stock" was purchased by them under the order of the court; and in this matter, as in all other matters here presented for revision, they are protected by the orders of the court, in the absence of fraud or collusion, of which there is no allegation or proof. They were agents, and not trustees; agents of the court, and not of the parties ; and the only question, as to them, is, whether they obeyed the orders of the court, and acted in good faith, and with reasonable skill and diligence. Perry on Trusts, vol. 1, p. 404; High on Receivers, §§ 264-86; 2 Woods, C. C. R. 518 ; 1 *Ib.* 330.

BROOKS & ROY, for the appellees who were complainants below.—1. On the former appeal, this court held, that the mortgage to Lamar and Hallett did not convey the Ashby branch-road, nor the lands acquired under the grant by Congress ; and this for the reasons, that neither of these was within the contemplation of the parties to that mortgage, and that the railroad company then had no authority to acquire the one, or to construct the other. The same principles apply with equal force to the new road constructed from Jacksonville to the Georgia boundary line. The railroad company had not built any part of it in 1852, and did not then contemplate building it, and was not authorized by its charter to build it ; and it was only authorized to build it, fourteen years afterwards, by a new charter, the provisions of which

recognize the necessary exemption of the new road from the operation of the mortgage on the old road. Like the "Ashby Branch," this new road was built under a new grant of corporate power, by a company in which other persons might and did become stockholders; and it was not a part of that "one main line in Alabama," which, as this court said, "was then in contemplation," and "became charged with a lien by the deed of that year."—53 Ala. 331. The covenant for further assurances does not affect this question in the least. That covenant extends only to the road and property conveyed by the mortgage—that is, "the railroad constructed and to be constructed as aforesaid," with its appurtenances, then owned or afterwards acquired. As to this road and this property, the covenant was inserted, for the purpose of "making more effectual the lien hereby intended to be created, and to embrace the said railroad, and the future construction thereof, together with all the other property, means and effects, intended hereby to be mortgaged." The covenant can-not be extended beyond the terms of the grant. There is no room for doubt, as to the property covered by each; and if there was any doubt, "the description in the mortgage must be deemed to refer to the charter."—*Seymour v. Railroad Company*, 25 Barbour, 284.

2. Under the amended bill, the complainants introduced in evidence the various charters granted by Alabama authorizing the construction of the original line of this road, and of connecting and tributary lines, and took testimony to prove what had been done under these several charters; thus showing the settled policy of the State with respect to that line, and to what extent it had been carried out.—See these charters in Session Acts 1844, p. 170; 1848, p. 265; 1849-50, p. 167; 1853-4, p. 438; 1859-60, p. 206. These acts show that, at the time the mortgage was executed in 1852, and for many years before that time, it was the settled policy of the State to establish a Grand Trunk Railroad Line, connecting the navigable waters of the Alabama and Tennessee rivers, with the view to secure extensive water-line communication from its northern and southern boundaries; and in pursuance of this policy, the public lands donated by Congress were granted by the State, by act approved 20th January, 1858, to the Alabama and Tennessee Rivers Railroad Company, and the Tennessee and Coosa Railroad Company, respectively, under the conditions and restrictions contained in the act of Congress.—Sess. Acts 1859-60, p. 3. The object of this great enterprise was not simply to connect Selma and Guntersville, nor yet to connect the waters of the Alabama and Tennessee rivers, but to connect their *navigable* waters, and form a rail-

road link in a great water-line of communication extending from the Gulf of Mexico to the head-waters of the Mississippi river. From its southern terminus at Selma, communication was to be had, through the navigable waters of the Alabama river, to the Gulf of Mexico; and from its northern terminus at Guntersville, unbroken communication was to be secured, through the navigable waters of the Tennessee, Ohio, and Mississippi rivers, with the Mississippi valley, and with the cities and markets, and the grain and meat producing regions of the great North-west.

And this enterprise was, for the most part, carried into effect. At the commencement of the war, the entire line from the Alabama to the Tennessee river was approaching completion, and its early completion was prevented only by that event. It was never suspended by the Alabama and Tennessee Rivers Railroad Company until, in 1866, under a new charter, its stockholders authorized a new enterprise, and an additional connection; and it has never been abandoned, in whole or in part, by the Tennessee and Coosa Railroad Company. At the beginning of the war, the former company had completed its road to Blue Mountain, 135 miles north of Selma; the grading was well nigh completed and prepared for the superstructure, from Jacksonville to Gadsden; and the iron for the balance of the road was on the way from Europe, and its arrival prevented only by the blockade. At the same time, the entire grading of the other road was under contract, from the Tennessee river to Gadsden; the company had received $250,000 from the State, and it is still operating a portion of its road, and contemplates the completion of its entire road. There was no change, during the war, of the purposes or plans of the Alabama and Tennessee Rivers Railroad Company; and the "Ashby Branch," which it was authorized to construct as a "military necessity," was abandoned when the necessity ceased. No less than five other companies were chartered, from time to time, and authorized to construct a railroad substantially over this route between Jacksonville and Rome; several of them had surveyed and located the route, acquired rights of way, and begun work, on substantially the same line which the consolidated company, composed in part of two of those companies, adopted and completed. All these facts repel the idea that the new road was in the contemplation of the parties when the mortgage of 1852 was executed. The building of the new road by that company would have been a radical and total departure from its original enterprise, and an invasion of the chartered rights of other companies.—Brice's *Ultra Vires*, 539-40. Besides, the route from Jacksonville to Gadsden, as a part of the old

route, has never been abandoned, or relinquished. The power to construct it was not taken away or impaired by the new charter granted in 1866, which gave power to construct a road, in addition, from Jacksonville to the boundary line. The consolidated company still has the power to extend its main line from Jacksonville to Gadsden; and if it should hereafter be constructed, and the present company is the same corporation which executed the mortgage of 1852, its liability to that mortgage can not be questioned.

3. But the consolidated company is, in fact and in law, a new corporation. As the case was presented to this court on the former appeal, the consolidation was alleged in the bill, according to its legal effect, and was fully admitted as alleged. It was not, then, an issue in the cause, and no testimony was taken on the point. It is insisted, therefore, that the consideration of the question, as an issue in the cause, is now presented for the first time, and it should not be concluded or prejudiced by what was said on the former appeal. What the court then said was based on the ground, that the charters of the two Georgia companies were not produced; that the only Georgia statute in evidence showed, or tended to show, that those companies, if not dissolved, had become wholly disorganized; and that there was no testimony showing that either of them had built any portion of its road, or had located any road, or owned any property or effects. These supposed defects in the evidence have since been supplied under the amended bill. It is now shown that each of these Georgia companies was duly incorporated and organized; that there never was any lapse or break in the organization of either before the consolidation was effected in 1866, and it was kept up even beyond that date by the stipulation of the parties; that each of said companies had surveyed, located and adopted the entire route for its road, had acquired rights of way thereon, had constructed and completed the road-bed for nearly half the distance between Dalton and the State line, and had built expensive and permanent bridges and culverts; that the same identical line, road-bed, grading, rights of way, bridges and culverts, were used by the consolidated company; that the enterprise of neither company was ever abandoned— that, on the contrary, at the time of the consolidation, each was in the full possession and exercise of all its original rights, powers and franchises, having a large number of stockholders, and owning a large amount of valuable property. It is shown, also, that the proposition to consolidate came from the Alabama company; that all the property and rights aforesaid, by virtue of the consolidation, passed into the hands of the consolidated company; that the stockholders in the Georgia

companies, to the amount of their stock therein, became stock-holders in the consolidated company, voted and participated, on terms of equality with the Alabama stockholders, in the control and government of the consolidated company, one of them afterwards becoming president of the company. These facts show the vitality and efficiency of the two Georgia companies at the time of the consolidation, and repel any argument founded on the assumption of the superior condition of the Alabama company; and if the failure to prove them before was material, in considering the legal effect of the consolidation as admitted, proper weight should now be accorded to them.

4. The effect of the consolidation of the three original corporations was the dissolution of them all, and, at the same time, the creation of a new corporation, with the property, rights, liabilities and stockholders, derived from the three passing out of existence. The terms used in the articles of agreement, and in the statutes of Georgia and Alabama authorizing and ratifying the consolidation, support this construction, and exclude any other. The consolidation of railroad corporations has become very common, and the courts have often been called on to construe the contracts and statutes by which such consolidation was effected. Under these decisions, which have established the American doctrine on the subject, the term *consolidation* has acquired a fixed, definite, accepted, and judicial meaning; which is, that it is a dissolution of all the original corporations, and, at the same instant, the creation of a new corporation, with property, rights, liabilities and stockholders, derived from those passing out of existence; and it is held inapplicable to a union of two or more companies in such a way that one of the original corporations is continued in existence, while the others are merged in, or absorbed by it.—Brice's *Ultra Vires,* by Green, 538-9, note, and 550; *McMahon v. Morrison,* 16 Indiana, 172; *Lanman v. Railroad Company,* 30 Penn. St. 42; *Powell v. Railroad Company,* 42 Mo. 63; *Clearwater v. Meredith,* 1 Wallace; *Bishop v. Brainard,* 28 Conn. 289-99. This term is, in all the statutes, carefully selected, used, and repeated, and no other term is used to vary its meaning. The conclusion, then, is irresistible, that it was used in the sense so fixed and established by judicial construction; that the legislature enacted, "not only the terms themselves, but their adjudged construction."—*Ex parte Vincent,* 26 Ala. 153; 5 Cranch, 42; 2 Peters, 18; 3 Gray, Mass. 451.

5. These authorities equally apply to the articles of agreement, or contract of consolidation, in which the same terms are repeatedly and exclusively used; and they must be pre-

sumed to have been used with a knowledge of their legal sig-
nification, and in the sense which the law attaches to them.
The several provisions of the articles, or contract of consoli-
dation, sustain this construction, and repel any other.   If the
transaction had been intended as a purchase or acquisition of
the Georgia companies by the Alabama company—as a trans-
fer of the corporate rights, property and franchises of the
former by the latter, or a merger and absorption of the
former by the latter—some peculiar and appropriate term
would have been used, such as *purchase, acquire, transfer,
merge, absorb,* or other equivalent term, none of which is any
where to be found in the contract.   On the theory that the
Alabama company absorbed the Georgia companies, and was
continued in existence under a new name, the parties were
guilty of the absurdity of providing that it should assume
and be liable for its own debts ; and of the further absurdity,
that its stockholders should continue its stockholders ; and
the additional absurdity is disclosed by the proof, that it
afterwards conveyed its property to itself.   All these things
were proper and necessary, if the consolidated company was
a new corporation, but are neither reasonable nor intelligible
on any other hypothesis.   The Alabama company, it is true,
owned more property, and had constructed more of its road,
than the Georgia companies ; but its debts exceeded its entire
assets, and it was insolvent, while the Georgia companies
were entirely solvent, and their debts were inconsiderable
when compared with their assets.   The three companies met,
therefore, on terms of equality, and provided for the form-
ation of a new company—" to unite together so as to form one
consolidated company, with all the rights, powers, privileges,
and franchises, now belonging to either and all of said com-
panies."   Examined in detail, every clause of the contract is
consistent with consolidation, and inconsistent with the idea
of acquisition, purchase, merger, or absorption.   The fourth
section, in one and the same sentence, speaks of the Alabama
company and the consolidated company, not as the same,
but as different corporations ; giving the president and board
of directors of the former " full power and control over all
the property of all of said companies, hereby made the prop-
erty of the consolidated company," and authorizing them to
go on with the extension of the railroad ; for which, in antici-
pation of the consolidation, the Alabama company had
already made a conditional contract with Breed, and it was
necessary to provide that the work should go on, without
interruption, until the consolidation was ratified, and a new
name adopted for the new company.   The new company not
being liable for the debts of the old companies, beyond the

[Meyer v. Johnston & Stewart.]

amount of property received from each of them respectively, special provision was necessary to guard against this result of the consolidation, and hence the fifth article was inserted in the contract, by which the new company assumed "all the debts, contracts, obligations and liabilities of each one" of the old companies. The sixth article is but a repetition of the fourth and fifth. The seventh section is an *ad interim* arrangement, and, at first glance, appears confused and confusing; but, when viewed in the light of the anomalous condition and surroundings of the parties, it is clear enough. Some time must necessarily elapse, before the corporate name of the new company could be given, and the new corporate organization perfected; and it was essential that organization should meanwhile be kept up, and that the stockholders of all the companies should meet together for the transaction of the business in which they were all interested. This special provision was therefore inserted; and the "next annual meeting of the stockholders of the Alabama" company was designated as the time and occasion for that convention. If the consolidated company was simply the Alabama company, there would have been no occasion to fix the time and place of holding its convention, since the charter provided for it; and the third article of the contract had already made the stockholders of the two Georgia companies stockholders of the consolidated company. The eighth article requires the parties to ask the enactment of a law, by both Georgia and Alabama, "giving one name to all of said companies hereby consolidated under authority from each of said States;" a proper and necessary provision for a corporation to be.chartered by both States, and to exert and exercise franchises in both; but without sense or meaning, if applied only to an Alabama corporation, which had already been authorized to change its name. The tenth article, again, is an arrangement *ad interim ;* an arrangement to continue "until a common name shall be lawfully given, and the franchises of each of said companies shall be united." During this interval, it is provided, the Alabama company is to be the "acting and controlling company;" acting, not for itself, but for its designated principal, the consolidated company, and so acting only "*until* a common name shall be lawfully given" to its principal. The eleventh and last article relates to the unpaid subscriptions to the stock of the two Georgia companies, which were comparatively new enterprises, and had a large number of unpaid subscriptions; while the proof shows that the Alabama company had been organized for fifteen years, and had no subscriptions to stock remaining unpaid. By the consolidation, these unpaid subscriptions became discharged

by operation of law.—*Nugent v. Supervisors*, 19 Wallace, 248; *Black v. Canal Co.*, 9 C. E. Green, 455; Brice's *Ultra Vires*, 539-40. While declaring their discharge, therefore, the contract reserves to them the right to pay up, at any time within three years, and become stockholders in the new company. The result, then, of the entire contract, is, that the first three articles create a new consolidated corporation, using the identical words and terms employed in the enabling statutes, and the remaining articles relate to the details of its organization.

6. Each of the old companies immediately conveyed all of its property to the new company. The Georgia companies did not convey to the Alabama company, but to the consolidated company, and the Alabama company did the same. This fact, as a contemporaneous construction of the contract, clearly shows the meaning and intention of the parties, as they themselves understood it. The ratifying legislative acts, both of Georgia and Alabama, carefully use the same adjudicated terms, and make provisions which were necessary and proper only on the theory of consolidation, but are entirely nugatory on any other theory. It would have been useless to empower the Alabama company to adopt a name or charter, since it already had both, and had authority to change its name; useless to provide that its debts should not be released by its acquisitions; and absurd for the legislature of Georgia to be thus legislating in reference to an Alabama corporation, when it was only necessary to grant it a license to extend its railroad into Georgia.

7. Such a joinder of stock, franchises, rights, property, and stockholders, as was effected by the consolidation in this case, created a new, distinct, and independent corporation, deriving its powers from both States, and invested with all the various rights, franchises and property of its components. *Clearwater v. Meredith*, 1 Wallace, 25; *McMahon v. Morrison*, 16 Indiana, 172; *M. & L. Railroad Co. v. Lomax*, 7 Indiana, 406; *Lauman v. Lebanon Railroad*, 30 Penn. St. 42; *Paine v. Lake Erie Railroad*, 31 Indiana, 283; *Bishop v. Brainard*, 28 Conn. 289-99, and 26 Conn. 549; *Shaw v. N. C. Railroad Co.*, 16 Gray, 407; *Hamilton Mutual Ins. Co. v. Hobart*, 2 Gray, 543; *P. & W. Railroad Co. v. Maryland*, 10 Howard, 376-88; 18 Wallace, 200-28; 14 Wallace, 654; *Nugent v. Supervisors*, 19 Wallace, 242; *Bush v. Johnson*, 21 Indiana, 299; 6 Vroom, N. J. 325; 4 Bissell, 78; 9 C. E. Green, 453; 33 N. Y. 421. Such consolidations are authorized and promoted by the settled policy of nearly every State in the Union, which has also been adopted in Alabama.—Session Acts 1868, p. 468.

8. Without regard to their legal rights, the equities of the

bondholders represented by the complainants appeal strongly to the court. They advanced the money to build this road, and to acquire this property, upon the faith of a new charter, authorizing a new enterprise, and providing that the mortgage on the new road, executed to raise the means to bring it into existence, should be " valid and binding according to the tenor and effect thereof;" which mortgage was recorded in every county through which the road run, or in which the mortgagor had any property ; and on the faith of the " articles of consolidation," authorized and ratified by the legislatures of both Georgia and Alabama, by which, in accordance with an unbroken line of adjudications for more than twenty-five years, a new corporation was created, whose future acquisitions would not be subject to the mortgages executed by the old companies ; and upon the faith of the solemn declaration and assurance, contained in the mortgage to the complainants, which recited all these facts and proceedings, that the mortgage given by the old Alabama company covered only the road from Selma to Blue Mountain. With the means furnished by these parties, and under these circumstances, this enterprise was resuscitated; the old road, which was fast lapsing into ruin and decay, was rebuilt and rehabilitated ; the new road was constructed, an outlet was secured, and a connection formed, which, independent of all else, greatly enhanced the value of the old road, and increased the security of the old mortgagees ; and a great highway, 235 miles in length, was constructed, equipped, and put in operation. The defendants, on the other hand, in seeking to subject this road and this property to their mortgage, claim what is not included in it, nor covered by it, either expressly, or by implication ; what was not brought into existence by their grantor, nor by their aid, means, or instrumentality.

9. As to the other points presented by the assignments of error, the appellees rely on their printed brief submitted on the former appeal, and the authorities therein cited.

MANNING, J.—When this cause was here before (53 Ala. 313 *et seq.*), it was unanimously decided, that the Alabama and Tennessee Rivers Railroad Company did not become dissolved and defunct by the consolidation with it of the Georgia and Alabama Railroad Company and the Dalton and Jacksonville Railroad Company, corporations of the State of Georgia, but continued to exist, with privileges enlarged, and resources increased, perhaps, under the new name of the Selma, Rome, and Dalton Railroad Company. This decision was founded upon the record, as it then was. After the cause went back, an amendment of the pleadings was made in the

Chancery Court, and additional evidence introduced, for the purpose of renewing the contention upon that point, with a record intended to present more fully the facts supposed to relate thereto ; and upon the second hearing there, the chancellor ruled again, that the charters of all three of the original corporations had been surrendered, and were vacated, by their union into one, and a new and independent corporation created in their stead.   This subject is, therefore, brought up for consideration again ; and the statute requires us to give judgment in a cause, when before us a second time, even though the facts remain unchanged, according to the opinion we may then have of the rights of the parties, without being bound by that pronounced on a previous hearing.

On examining the new evidence, we do not perceive that it materially changes the situation and condition, previously inferred, of the Georgia companies, at the time of their consolidation with the Alabama and Tennessee Rivers Railroad Company of Alabama.   True, it is proved that those companies had chosen and surveyed the routes for their respective railroads ; that the Georgia and Alabama Railroad Company had acquired some real estate in Rome, worth about $4,000 in August, 1866, when the agreement to consolidate was made ; and that up to the time when they discontinued work in 1861, each had graded, or done the greater part of the grading of thirteen or fourteen miles along the routes they had respectively selected.   Of which work, Mr. Barney, the engineer, testified, that in 1866, " in most instances, the grades were badly washed, overgrown with trees and bushes, and were otherwise of comparatively little value."   The greater part, however, of the route on which this work was done, was taken for, and applied to the use of the Selma, Rome and Dalton railroad, as were also the piers of a destroyed bridge of one of the companies, over the Etowah river, and some other masonry.   All the money and means derived from the stockholders of the Georgia companies, including the proceeds of bonds issued to the amount of $25,000 by Floyd county, Georgia, to one of them, were expended ; and the work abovementioned and the real estate in Rome, with some rights of way to a small extent, for their roads, alone remained to those companies, as the result of, and to represent all the money, and means available as money, which they had received from any and every source.   They also owed debts to a considerable amount.

In 1866, they owned no personal property whatever, not even horses, mules, or implements to work with ; not a foot of railroad had been completed ; and no money was due to either company, except from stockholders upon the shares of

capital subscribed, which had been only partially called in, or
paid up, to an extent, perhaps, of about one-fourth of their
subscriptions.    Whether any more payments upon these
shares would then be called for or not, depended upon the
will of the stockholders themselves; and after the great
changes produced by the war, and when the companies were
without employees, or implements of any kind, or money in
their treasuries, a majority of the corporators might be very
unwilling to resume labors which had been discontinued in
186., and the greater part of which would have to be done
over again.    Whatever may have been the desire or design
of certain individuals among them, no action appears to have
been taken on behalf of either of the Georgia companies ; no
symptom of corporate life exhibited, during the latter years
of the war, or after it, until, in the early part of 1866, Mr.
Lapsley, at one time president, and then a director of the
Alabama and Tennessee Rivers Railroad Company, by its
appointment, went to Georgia to ascertain what could be done
toward obtaining, through the co-operation of the Georgia
companies, the right and authority to extend and complete
the railroad of his company, through that State, to Dalton,
over the routes which had been selected by them.    Then, the
persons who had been elected directors, at the last preceding
conventions of the stockholders of those companies in 1861
or 1862, for the term of one year, without express authority
from charters, or any other source, to serve longer, came
together, to confer as the boards of directors of their respect-
ive companies, with Mr. Lapsley, on the subject of his mis-
sion ; and it was, as he testifies, in accordance with his
advice to one of these boards, and "for the purpose," among
other things, "of curing defects in the organization of the
company, that may have been caused by non-action of the
said company during the war," that the act of Georgia of
February 14th, 1866, relating to the Georgia and Alabama Rail-
road Company, was procured to be passed.    Doubtless, it
was also upon the like advice, that, eight days afterwards,
February 23d, 1866, the similar act of the same State, relat-
ing to the Dalton and Jacksonville Railroad Company, was
enacted.

   These statutes, referring to the obstruction of business
caused by the war, authorized a majority of the persons last
elected directors of these companies respectively, to meet
together, and act as such, and to assemble the stockholders
of each, for the election of new directors, in conventions to
be held at times and places to be specified in the notices
required to be issued therefor.    And the statutes further-
more, besides other provisions, empowered the companies,

through their respective boards of directors, to unite and consolidate "the roads, and stock, and franchises" of each, with those of the other, and with those of any other company in Georgia or any adjacent State, "to *such extent, and on such terms*, as may be agreed on by and with the company or companies entering into agreement with them." What the stockholders of those companies, when assembled in the conventions thus provided for, resolved to do, or would have done by themselves alone, we are not informed; but the boards of directors they elected, while stipulating in the contract of consolidation, of the 8th of August in the same year, that their constituents should have stock in the consolidated company, to the amount which they had before that time paid to their own, respectively, also took care to provide that they should not be required to pay any thing more upon their unexhausted subscriptions, to the consolidated company; and it is proved that no one of them ever did pay one dollar more.

We have said nothing of the lots and unimproved real estate at Dalton, which Moore, one of the trustees in the deed, valued at from $10,000 to 20,000, and White, the secretary of the Dalton and Jacksonville Company, valued at $200,-000. They were subject to the trusts of the deed of a corporation called the "Dalton City Company," executed in August, 1859, to assist in the construction of the railroad of the former of these companies. Which deed provided, that for one-half of the proceeds of said property, that should from time to time be paid by the trustees to the railroad company, it must issue its certificates of stock at par, and for the other half its thirty-year bonds, bearing an annual interest of seven per-cent., and convertible into stock at par, to the Dalton City Company; and further, that the trustees should not, at any time, without consent of the grantor, sell or dispose of more of said property than would be then required to raise the same proportion or per-centage of the estimated value of the whole thereof, as should be exacted of "other stockholders," upon the amounts of their subscriptions. This land company, therefore, was in the category of the subscribers for stock. Of its contributions, as of those of the other stockholders of the railroad company, nothing remained in 1866, except the grading done before and in 1861, and the right of way in some undefined portions of the route. The land company, like the rest, for the sum it had paid into the railroad company, obtained under the contract of August, 1866, its certificates of stock in the consolidated company, and its release from all further payments; of which it never afterwards made any.

Certainly, we can not say, upon evidence like this, that the

attitude and condition of these Georgia railroad companies were so much better than they appeared to us to be on the former appeal, as materially to affect the argument concerning the effect and result of their consolidation with the Alabama company. Nor do we think this argument is either strengthened or weakened, on one side or the other, by the production of the several enactments of this State before 1866, made to create and encourage other corporations to build railroads from Jacksonville, or Gadsden, in Alabama, to Dalton, or other places in Georgia, or between other points or places. By none of these was any such work performed. The evidence only shows a prevailing opinion that such a connection was desirable. Nothing though, or next to nothing, was done to effect it, until the Alabama and Tennessee Rivers Railroad Company obtained the right to extend its railroad on from Jacksonville toward Dalton, with the purpose of completing it through Georgia to that place, if authorized by Georgia to do so, and entered into negotiations with the companies before named, in order to obtain such authority.

In our former opinion, we perhaps intimated, that this change of direction, from a railroad yet to be built, which should connect Gadsden with the Tennessee river at Guntersville, to a railroad already built connecting Dalton with the same Tennessee river at Chattanooga, did not seem to us a radical departure from the original object for which the Alabama and Tennessee Rivers Railroad Company was incorporated. Against this view, complainants' counsel express strongly their dissent. "The object," they say, "of this great enterprise, which was thus fostered by the State in so many ways, was not to connect the town of Selma with the town of Guntersville: it was vastly greater and farther reaching than this. It was not alone to connect the waters of the Alabama river with the waters of the Tennessee. . . . . The State designed, by this *Trunk Line*, to form a railroad link in a great water-line of communication, extending from the Gulf of Mexico to the headwaters of the Mississippi river. From its southern terminus at Selma, communication was to be had, through the navigable waters of the Alabama river, to the Gulf of Mexico; and from its northern terminus at Guntersville, unbroken communication was to be secured, through the navigable waters of the Tennessee, the Ohio, and the Mississippi rivers, with the Mississippi valley, and with the cities and markets, and the grain and meat-producing regions of the great North-West." If that was indeed the achievement then meditated—if the intention was, by this railroad, to bring the commerce of that vast and opulent

[Meyer v. Johnston & Stewart.]

region through this State, by way of Selma and the Alabama river, to the Gulf of Mexico, whence it could go to all the parts of the world; even this magnificent scheme could be more easily accomplished, by way of Dalton and Chattanooga, and the railroads extending thence to the rivers and cities of the great North-West, than by way of Gadsden and Guntersville. For no available unbroken line of water-communication with the great Mississippi valley beyond was then possible, or supposed to be practicable in the future, to and from Guntersville, over the obstructions below that town, caused by the Muscle Shoals in the Tennessee river. The proceeds of 400,000 acres of valuable land had been expended, before that railroad company was incorporated, toward executing the design of making a navigable canal around the many miles of these rocky shoals; but so small was the effect produced, in comparison with the hugeness of the obstacle, that the project was abandoned, as one not to be realized, and was never afterwards, in that day or generation, resumed.

It may be, though, as we suppose, that the object proposed in the building of this railroad was the less ambitious one of drawing into the interior of, and through Alabama, a large part of the trade of the rich valley at the northern end of this State, above the Muscle Shoals, and of the fertile lands extending thence away up into East Tennessee above Knoxville; to which place, and often beyond it, the Tennessee river and its large tributaries were navigable; and if this were the object of the enterprise, certainly it was not ignored by the continuation of the railroad straight on to Dalton, instead of turning it off, as first intended, at right angles, to go to, and terminate at Gadsden, on the Coosa river.

2. No advantage can result from a further examination of the new evidence on this branch of the subject. Since it was obtained, complainants' counsel do not themselves appear to place much reliance upon that evidence. Certainly, it imparts but little, if any, force to the elaborate argument in which they vehemently controvert, upon the same evidence then before us, our former conclusion upon this point; a controversy which the statute authorizes them to wage again in this court, but not in any forum of inferior jurisdiction. The observations we have made, concerning the new evidence, were made in deference mainly to the learned chancellor, and to the impression it produced upon his mind. For, it was in consequence of the effect which, in his opinion, was due to the new matter brought into the case since the former appeal, as he himself declares, and as our respect for him would have induced us to presume, that he has undertaken to render a decree in opposition to the judgment heretofore pronounced

by this court. We can not question the sincerity of that declaration. For the learned chancellor well knows, that, however justifiable it may be to discuss the views, and oppose the conclusions of an appellate tribunal, any where else, it is wholly inconsistent with official duty and propriety, that this should be done in a judicial opinion in the same cause, by a magistrate or court whose decision therein has been reviewed and overruled. In every well-ordered state, there must be subordination and obedience to legitimate authority. These are the prime exigencies of civil society. Judicial supremacy in Alabama is vested in her Supreme Court only. This is the institution designed and designated by the constitution itself, for the correction of the errors of other jurisdictions; and no magistrate, or body of magistrates, of any of such subordinate tribunals, can assume to perform that function of superior judicial power, in regard to or upon the judgments and decrees of this court, or refuse to obey them, and carry them into effect, in cases within his or their cognizance for that purpose, without usurping authority, setting law at defiance, and, perhaps, a violation of official oaths. It is only when a case is materially changed, as the chancellor thought this was, by new matter legitimately brought into it after the judgment of the Supreme Court therein has been rendered, that such judgment ceases to be binding upon the tribunal to which the cause has been remanded.

3. In their very elaborate and able reargument of this topic, complainants' counsel have fallen into some serious errors. They set out with the assumption, which the chancellor also adopts, that the question whether the Alabama and Tennessee Rivers Railroad Company continued to exist under the name of the Selma, Rome, and Dalton Railroad Company, did not arise for our decision upon the pleadings in the record formerly here; because, they say, complainants alleged, and defendants admitted, the consolidation of the three companies into one, to which the latter name was given. But, first, it was not thereby agreed, as we shall see more distinctly hereafter, that this consolidated company was not the Alabama and Tennessee Rivers Railroad Company, with enlarged rights and powers, under a new name; and, secondly, if there had been an agreement of that kind in the bill and answers, yet the contracts, proceedings, and statutes, by which the consolidation was accomplished, were so fully set forth, and proved as facts, that their effect, the legal results they produced, were judicial questions, which the courts must needs consider. In a litigation involving the nature and obligations of an institution like this railroad company, and in which the interests concerned, public and private, are so

many, various, and important, it is not within the province of counsel or their clients to determine by agreement among themselves—but an office incumbent on the judges, to ascertain and declare—the relations, rights, and duties which the law makes, consequent upon the acts and transactions set forth and established.

4. Another and more serious error, inasmuch as it constitutes the foundation of almost the entire argument on this point, of complainants' counsel, is the assumption, that the words, *consolidation, consolidate,* and *consolidated,* have " a fixed, definite, accepted, and judicial meaning," and " adjudged construction ;" according to which, they are " inapplicable to a union of two or more companies, in such a way that one of the original corporations only was continued in existence, while the others were merged or absorbed in it ;" and " that the dissolution of all the old corporations, and the creation of a new one, *are essential to consolidation,*" according to " the American view " of the subject. Possessed by the conviction, as the chancellor also seems to have been, that this was the long-established and invariable meaning of the terms *consolidation* and *consolidated,* counsel erect upon the narrow basis afforded by the frequent use of these words (more convenient than any other), in the agreement of the 8th of August, 1866, and in the legislative acts of the same year, relating thereto, almost the entire superstructure of their argument, the substance of which is shown by the following extracts :

" Now, for *many years prior* to the passage of these enabling and ratifying acts by the legislatures of Georgia and Alabama, the term *consolidation,* when applied to railroad corporations, had, by judicial construction, obtained a fixed, definite meaning ; a meaning so well settled, and so general, as to be known as the 'American doctrine.'     .     .     .     When, therefore, the two legislatures, and the parties to the contract, carefully excluding all others, selected, used, and repeated these precise terms, the conclusion is irresistible," that they were intended to be used in the sense so fixed, defined, and established. The legislatures 'enacted not only the terms themselves, but their adjudged construction.' The effect and result, therefore, of the contract here authorized, made, and ratified, was a dissolution of the three corporations named, and, at the same instant, the creation of a new corporation, with property, liabilities, and stockholders, derived from those passing out of existence."

The latter portion of the last foregoing sentence is a quotation from the opinion, in *McMahon v. Morrison* (16 Ind. 172), of the Supreme Court of Indiana, in 1861, repeated in the

Supreme Court of the United States in 1863, to express brief-
ly the effect of proceedings had in a particular instance, under
a statute of Indiana, whereby three railroad corporations
were, by two successive agreements, united, "under the *acts
and terms* of consolidation," into one. The language of the
statute was: "Such railroad companies are authorized to
merge and consolidate the stock of the respective companies,
*into one joint stock company of the two railroads thus connected.*"
*Clearwater v. Meredith,* 1 Wallace, 26. Here was the author-
ity to them to consolidate. What the agreements of the par-
ties were, "the acts and terms of consolidation," the reports
of these cases do not show. They relate, however, to the
same undiscussed, and, therefore, we presume, unambiguous
transactions. And the Federal court was governed, accord-
ing to its rule, by the decision of the Supreme Court of the
State, in respect to an incorporation under its statute laws.
It is this Indiana case, on which the learned editor of Brice's
*Ultra Vires,* Mr. Green, from whose notes to that work com-
plainants' counsel and the chancellor quote the preceding
definitions, founds his suggestion, that this may be regarded
as the "American view" of the meaning of *consolidation,* when
used in reference to railroad companies. But it was nearly
ten years *after* the agreement of the 8th of August, 1866, and
the acts relating thereto, of Georgia and Alabama, were en-
acted, that this edition of Brice's *Ultra Vires* was published
with the notes of Mr. Green; and we are not aware that,
before that time, the doctrine so much insisted on, as conclu-
sive in this case, was ever promulgated by any body.

The learned editor's notes were appended to his author's
chapters on the subject of what is called, in England, the
"*amalgamation*" of corporations; which seems to us, in this
country, a singular application of that word. In its origin
and use, it is peculiarly technical. It pertains especially to
the arts, and belongs to the language of physical science; and
inasmuch as, by amalgamation, as ordinarily understood, a
material product results, which, by transfusion into it of the
properties and qualities of the two or more material things
from whose union it proceeds, partakes of the nature of each,
and is yet unlike either, it is not surprising that English
judges have had trouble in perceiving the appropriateness of
the word, to not a few of the cases of united corporations that
have come before them. When parties and parliament, in
providing for the union of two or more corporations, passed
by familiar words, that were not inapplicable, and have a
broader meaning—such as combination, conjunction, associa-
tion, union, coalition, consolidation—and selected, as expres-
sive of their purposes, so technical a term as "amalgama-

tion," judges felt constrained to preserve, as far as possible, its original and peculiar signification in this new application of it to legal subjects.

Said PAGE WOOD, V. C., in the *Empire Assurance Company, ex parte Bagshaw* (L. R. 4 Eq. 341, 347): "It is difficult to say what the word 'amalgamate' means. I confess, at this moment, I have not the least conception of what the full legal effect of the word is. We do not find it in any law-dictionary, or expounded by any competent authority."—*Ultra Vires*, 510. So, in another case, the same vice-chancellor said: "I do not find any where any technical definition of the term 'amalgamate,' and I have some difficulty in getting at its exact meaning. . . . . Mr. Jessel says, it consists in making two companies into one; but that is scarcely sufficient. . . . I should rather assume an amalgamation to be where both companies agree to abandon their respective articles of association, and to register themselves under new articles, as one body. That would be a new company, formed by the coalition or amalgamation of the two old companies."—*In re Bank of Hindustan, Higgs' case*, 2 H. & M. 666; Green's Brice's *Ultra Vires*, 509–10, note.

Correct as this view seems to be, the English courts have not succeeded in confining to such instances even the word "amalgamation." And certainly Mr. Green is mistaken, in supposing that the broad, untechnical term, *consolidation*, commonly used on similar occasions in this country, has been restricted by our American courts to like cases of a particular character, and contracted to a narrower meaning here, than is affixed to "amalgamation" in Westminster Hall.

One of the cases referred to, in support of that position, is *Lauman v. Lebanon Valley R. R. Co.* (30 Penn. St. 42), decided in 1858; but it is an authority to the contrary. An act of the legislature of Pennsylvania, of May 5th, 1857, made it "lawful for the Lebanon Valley Railroad Company to merge its corporate rights, powers, and privileges, into the Philadelphia and Reading Railroad Company, so that, by *virtue of this act, the two companies may be consolidated into one*, and so that all the property, rights, franchises, and privileges, now by law vested in the said Lebanon Valley Railroad Company, may be transferred to, and vested in the said Philadelphia and Reading Railroad Company," &c.; and section 2 provides, that "said *consolidation* and merger shall be made" by articles of agreement between the directors and managers of the two, which must be ratified by the stockholders, certified by the secretaries, and filed in the office of the secretary of State; "whereupon, the said agreement shall be deemed and taken to be the *agreement and act of consolidation of said companies*."

The title to this statute was as follows: "An act providing for the *consolidation* of the Lebanon Valley Railroad Company *and* the Philadelphia and Reading Railroad Company."—Penn. Laws of 1857, No. 455. The opinion of the court, by LOW-RIE, C. J., begins thus: "The Lebanon Valley Railroad Company proposes to enter into a contract of *consolidation* with the Philadelphia and Reading Railroad Company, and an act of assembly, passed last year, authorizes them to do so." "What will be the effect of this *consolidation* of these two companies, as authorized and proposed? 1. The Reading company will extend its chartered rights, privileges and duties, from Reading to Harrisburg, while still preserving its name, and therefore its *legal* identity. . . . 3. . . . The Lebanon company loses its actual identity, abandons its name, and therefore its legal identity and its corporate existence, and can no longer claim any legal recognition. This is called a *merger* of the Lebanon corporation into the other; but such a merger is a dissolution, destroying the actual identity of both, while the legal identity of one of them is preserved; as where a life-estate is merged in a fee-simple, one being destroyed, and the other enlarged by the operation."—Pp. 44-5. Obviously, therefore, neither the legislature, nor the Supreme Court of Pennsylvania, considered that "*consolidation would be inapplicable* to a union of two or more companies in such a way that one of the original corporations only was continued in existence, while the others were merged in, or absorbed by it;" or, as the same idea is otherwise expressed, "*that the dissolution of all the old corporations, and the creation of a new one, are essential to consolidation.*"

Nor did the Supreme Court of Indiana entertain or intend to express that idea in *McMahon v. Morrison, supra.* This is not only deducible from the opinion in that case, but is evident from the opinion in *Eaton & Hamilton R. R. Co. v. Hunt* (20 Ind. 457), of the same court, delivered only two years afterwards, by the same judge (PERKINS, C. J.). "Legislative acts of Ohio and Indiana authorized the Eaton and Hamilton [of Ohio] and the Richmond and Miami [of Indiana] railroad companies, to *consolidate, on such terms as might be agreed upon,*" says the learned judge. Accordingly, a contract was entered into (p. 461), which declares: "*First,* these companies, their capital stock, their roads, debts, dues, rights in action, franchises, interests, and property of every kind, . . . are *merged, united, and consolidated into one joint-stock company,* one road, one interest, and one property, upon the terms following. . . . *Second,* the corporate name, franchises, rights, immunities, and organization of the Eaton and Hamilton Railroad Company shall be preserved,

and remain intact, and the said *consolidated* company shall be known by, and its business transacted in that name; in every sense, as if this *consolidation* had not taken place," &c. There does not appear to have been any ratifying statute.

Throughout the opinion, the transaction is spoken of as a *consolidation;* although, as the judge says, it "appears that, by *the act of consolidation,* the exact existence of the Ohio company is continued, while that of the Indiana company is extinguished, after all its property is transferred to the Ohio company." In this case, the agreement of the parties, not the statute, is spoken of, as "the act of consolidation;" as, in the others, the agreements are spoken of as "the act and terms of consolidation," and "the agreement and act of consolidation," respectively.

In regard to the meaning of these terms, we will cite only one case more, that of *The Central Railroad and Banking Company of Georgia v. The State of Georgia,* 92 U. S. 665. A statute of that State authorized "the Macon and Western Railroad Company, and the Central Railroad and Banking Company of Georgia, . . . *to unite and consolidate the stocks of the said two* companies, and all the rights, privileges, immunities, property, and franchises, belonging or attaching to said companies, *under the name and charter* of the said 'The Central Railroad and Banking Company of Georgia,' in such manner that each and every owner and holder of shares of the capital stock of the Macon and Western Railroad Company shall be entitled to, and receive an equal number of shares of the capital stock of the *consolidated company;*" *provided,* that nothing therein should "discharge *either* of said companies" from any of its contracts, but that they should *all* "*be assumed* by, and be binding on the Central Railroad and Banking Company of Georgia," &c.

It was insisted there, as well as here, and doubtless upon the supposed peculiar force of the words "unite and consolidate," and "consolidated companies," and "union and consolidation" (which are also in the act), that the statute contemplated a surrender by the original corporations of their charters, and the creation of a new corporation, which should receive *the name* of one of those passing out of existence, and "the grant to it of a new charter, or a regrant of the old." (P. 670). Else why, it was probably urged, as it is here, if the consolidated company is no other than the original Central Railroad Company, with enlarged property and privileges derived from the other company, is there no mention of the words *merger, or absorption, or selling out,* in the statute, and why is that company made to commit "the absurdity of assuming its own debts and liabilities?" But the Supreme

Court of the United States unanimously decided against that view. Its opinion repudiates the theory, that of necessity, and *ex vi termini*, a new corporation must be produced by the *consolidation* of two or more previously existing ones; and its judgment is in accordance with the rulings in the cases before referred to, and not in conflict, we believe, with any other that is reported.

We do not remember that there was any other than this recent decision of the Supreme Court of the United States which attracted the attention of the chancellor and counsel, as at variance with their theory or doctrine; and though they elaborately pointed out the differences between that case and the present, they evidently did not yield assent to the opinion in the former. They cling, on the contrary, to the definitions with which they set out, as established by the "adjudged construction" of "adjudicated terms;" and so dominating had their ideas of these become, as to urge them into another serious error.

One of the chief pillars of their argument is, that the Georgia companies had no authority from the legislature of their State to enter into an union, by which one of the contracting corporations should survive another, or the others, and continue to exist, with the stockholders, property, and rights of the latter, as its stockholders, property and rights; but that, however advantageous this might be to all concerned, or however much insisted on, yet the existing corporations must all perish, and a new one be brought into being as the consolidated corporation, though to be endowed only and exactly as such survivor might have been. In emphatic language, counsel say: " "There is no word, term, or expression, in those enabling acts, in their charters, or in any act of the legislature of Georgia relating to these companies, that tends to authorize any such sale, transfer, merger, or absorption;" that is, to put it in words which will not delude, to authorize a union of the rights, property and effects of one or more of the original corporations, with those of another, coupled with a provision that the stockholders of the former should become and be stockholders of the latter also. Alluding to the statutes, counsel proceed: "The terms used, and the only ones used, are these: that said companies 'are hereby authorized and empowered   .   .   .   .   to unite and consolidate their road, stock and franchises, with the road, stock and franchises (of each other), and any other railroad company of this or any adjacent State.'" Here they stop. Nothing but the conviction that "the dissolution of all the old corporations, and the creation of a new one, are essential to consolidation," and that the terms, "*unite* and *consolidate*," no matter how

qualified, necessarily import this, could have prevented counsel from seeing any thing material in the words immediately following those they cite, and therefore from quoting the sentence to the end. If they had done so, it would appear that the corporations referred to were authorized, by the statutes of Georgia, "to unite and consolidate their road, stock and franchises," with those of each other, and those of any other company of that or any adjacent State, "*to such extent, and on such terms, as may be agreed on, by and with the company or companies entering into agreement with them ;*" and it could have been only because fully prepossessed by the same conviction, that the chancellor, in pursuing the same line of argument, although he sets forth this additional clause, concedes to it no effect, and makes on it no comment whatever.

Yet, as we before have seen, it was under laws similar in phraseology, but less emphatic, perhaps, that the same court and judge of Indiana, on whose brief opinion, in another case, the interpretation we have discussed was made chiefly to depend, upheld, as a consolidation, a union between two railroad corporations of different States, by which, while one of them was extinguished, the other acquired, according to the agreement of the parties, its rights and privileges, and became in part the property of its stockholders. "Legislative acts of Ohio and Indiana," says the Chief-Justice who delivered the opinion, authorized these "railroad companies to *consolidate upon such terms as might be agreed upon.*" That was the authority for their union. What their agreement was, has been shown heretofore. Their right to enter into it, under the statute, was thought so clear, that it was not made the subject of argument.

Doubtless, other similar cases might be found, if sought for. But, if our minds be disabused of the error previously combatted, authorities of this kind are not needed. This proposition, we think, is plainly established. When the rights, franchises, and effects of two or more corporations, are, by legal authority and agreement of the parties, combined and united into one whole, and committed to a single corporation, the stockholders of which are composed of those (so far as they choose to become such) of the companies thus agreeing, this is in law, and according to common understanding, a consolidation of such companies ; whether such single corporation, called the consolidated company, be a new one then created, or one of the original companies, continuing in existence with only larger rights, capacities and property. Acceptance of this as correct, makes it easy to understand, that authority given to consolidate, "to such extent, and on such terms, as the parties may agree upon," confers the power to

constitute one of the original companies the consolidated company. And the 11th article of the contract with A. D. Breed, made several months after the passage of the enabling acts of Georgia, leaves little room to doubt that these were understood by the parties concerned, as conferring this power.

The authority being granted, the inquiry is then reduced to this: Whether, by the articles of agreement in this case, and the statutes ratifying them, the consolidated company is a new corporation, or the Alabama and Tennessee Rivers Railroad Company, with rights and property enlarged, under a new name.

On this question we must refer to what was said in our former opinion in this cause.—53 Ala. 313 *et seq.* The further observations we shall make, will relate chiefly to the language of the agreement and statutes, and be made in response to the criticisms of the same by counsel and the chancellor. We premise, however, that a consolidation of corporations, though accompanied by a transfer of property, is quite different from a mere sale, and might at that day have involved, especially when to be effected under the laws of two different States, very embarrassing considerations. There were no established forms for instruments to be used for such a purpose. It had been said, also, in judicial opinions, one from the Supreme Court of the United States, that two States could not jointly create, or unite in creating, one and the same corporation; and it was not until 1870 that this doctrine was overturned, in *Railroad Company v. Harris,* 12 Wallace. It is to be observed, too, that the enabling statutes do not themselves undertake to create a new corporation.

Let us look now to the contract of consolidation. The first three short articles, and the 5th, very naturally set forth, first, the agreement to consolidate the three companies into one, which shall possess the combined rights, property, and privileges of them all, and be composed of the stockholders of all, to the extent of their several payments, and be responsible for the debts of all. These four articles are almost the exact equivalent of the first article, above set forth, of the similar agreement in *Eaton & H. R. R. Co. v. Hunt, supra* (20 Ind. 460), and of the first article in that of the *Philadelphia, Wilmington & Baltimore R. R. Co. v. Maryland* (10 How. 383). But the parties did not go on, as in the latter case (intending to create a new corporation) they did, to frame a charter of incorporation for a new company, by prescribing the number of its shares of stock and the amount of each,—when, where, and how such new company should be organized; what its name should be; the number of its directors, or other officers; how they should be appointed, and the pow-

(42)

ers they should possess; or any of the other provisions neces-
sary in a charter of incorporation, that relate to the interior
structure and action of a body politic, and give it vitality and
individuality as such. Nothing in these four articles, of this
contract of consolidation, decides, or was intended to decide,
under what charter of incorporation the company should be
organized and operate, or, therefore, what particular institu-
tion, or body politic, should possess, employ and exercise the
rights, property and franchises thus combined, and be the
consolidated company.

This is first provided for in the 4th article, as follows:
" The president and board of directors of the Alabama and
Tennessee Rivers Railroad Company shall have and exer-
cise full power and control over all the property of all of said
companies, hereby made the property of the consolidated
company, and    .   .   .   *shall cause the railroad, which is now
completed from Selma to Blue Mountain, to be extended and
completed from Blue Mountain, by way of Rome, to Dalton, over
the best and most practicable route ;* and to enable them to do
so, and to liquidate the debts of said company, the said pres-
ident and directors are hereby authorized to issue bonds, and
execute a mortgage or mortgages on any part or all of the
property and franchises of all of said companies, including
the road-bed and right of way from Selma to Dalton."

Possession and control of the common property and inter-
ests are hereby unreservedly conferred; and the duty is im-
posed of carrying on the great work, to accomplish which
the consolidation was effected, not temporarily, but to *comple-
tion*, all the power which the constituent companies them-
selves had, or could grant, being conferred to insure its
execution. And no where else in the agreement, is the
duty or authority to build and complete the road to Dalton,
or, consequently, the franchises necessary for its accomplish-
ment, transferred or given to any other company, whether by
a description of it as the consolidated company, or by any
other designation.

Language could have been used, which more directly and
explicitly would have constituted the Alabama company the
consolidated company. Perhaps, this was prevented by
doubts existing as to the proper manner of effecting it, under
the acts of two separate States, and by the impression that
the original corporations ought, as existing, individual entities,
jointly to engage to abide by and confirm whatever the con-
solidated company, or the Alabama company as the consoli-
dated company, might do in the premises, until the authority
should be perfected and perpetuated by ratification. But,
however that may be, it is clear from this article, and the

6th and 7th (to be considered next), that the intent of the parties was to invest the Alabama and Tennessee Rivers Railroad Company with all the property, powers and franchises, to be possessed and exercised by the consolidated company, for the performance of its functions. It was the consolidated company, or there was none.

The 6th article declares: "All acts, contracts, and obligations, done and made, or assumed, by and under the authority of the president and directors of the Alabama and Tennessee Rivers Railroad Company, and all such acts, contracts and obligations, hereafter done, made or assumed, by or under the authority of said president and directors, shall be valid and binding on all of said companies hereby consolidated into one." This appears to be a reiteration of what had, in effect, been declared in the 4th article, and to have been written under the influence of the same doubts and impressions, with the view of establishing beyond cavil the authority of the Alabama corporation to act for "all of said companies [thereby] consolidated into one," as in fact that one.

The learned chancellor and counsel have ingeniously and elaborately argued, that the provisions of this and the 4th article relate only to an *ad-interim* arrangement, or administration; and this, by the president and board of directors of the Alabama company, as special agents, and not by the company itself. In regard to the latter point, such an interpretation is but "a sticking in the bark." Behind those officers is the company they represent, which elected them such, and to which only they report and are responsible; and as it is only through and by them that it could act in its corporate character, we must understand the company as here itself referred to. In the 10th article it is declared, by its full original statutory name, to be "the acting and controlling company." The subject of an *ad-interim* arrangement is brought up again, and will then be further considered.

The 7th article provides: "That at the next annual meeting of the stockholders of the Alabama and Tennessee Rivers Railroad Company, all the stockholders of each one of said companies shall have a right to vote, either in person or by proxy, according to the amount of his or her stock." And the evidence shows that, at that time, stockholders of the Georgia companies came to Selma, where the office of the Alabama company was, and took part with those of the Alabama company, all acting together, in the election of directors at that meeting. This was in May, 1867, the time for the regular annual meeting of that company.—Depositions of Thos. A. Walker, Edward White, D. J. Printup. What else was done at that important meeting, and by the board of

directors before and shortly afterwards, was, of course, entered on the minutes of the proceedings; which, if produced, ought to throw light on the subject. But we have nothing from the Selma, Rome, and Dalton Railroad Company, or its officers, who, on this branch of the controversy, are on the side of complainants, to show what those proceedings were. Doubtless, they were entered in the old book of the minutes of the Alabama and Tennessee Rivers Railroad Company; which book, and others, were consumed when the office of the Selma, Rome, and Dalton Railroad Company, in Selma, was destroyed by fire, April 29th, 1870. The testimony of Chapman, its secretary and treasurer, is express, that this book was among those then burned. "The current books of the Selma, Rome, and Dalton Railroad Company," opened, of course, after the adoption of that name, and after that convention of stockholders, in May, 1867, less than three years before, were all saved; and among these, doubtless, the book of minutes of its subsequent proceedings. What the first entries in it were, and when made, does not appear.

Complainants' counsel say of this 7th article : "This was, also, an *ad-interim* arrangement, and, at first glance, appears confused and confusing." They explain the article, after this manner : "Some time must elapse before the new corporate name could be obtained, and a new corporate organization be perfected. *Meanwhile,* it was essential that organization should be kept up, by the annual convention of stockholders of such companies, prescribed by law ; and that the stockholders of all three companies should now meet together, for the transaction of the business, in which all were now interested. . . . . The parties, therefore, provided, that such a convention should be held 'at the next annual meeting of the stockholders of the Alabama and Tennessee Rivers Railroad Company.' . . . It was a special provision, for the one meeting of all the stockholders of the three companies, which would have to be held *in the interval,* before the new corporate name could be obtained, and the new corporate organization perfected." This is the conclusion to which the chancellor also comes.

The error of this argument is manifest. Neither was there in fact, nor was it expected there would be, any such *interval* between the date of the contract of consolidation, August, 1866, and the time when "the new corporate name could be obtained," as to afford room in the meantime for this imaginary preliminary convention, of which counsel speak, and which was never held. It was well known that, according to law, the legislatures of Alabama and Georgia would severally convene, as they did, in the following November, only a little

[Meyer v. Johnston & Stewart.]

more than three months afterwards; while the "next *annual meeting*" of the stockholders of any of these companies would not be held until the subsequent spring or summer.* That of the Alabama and Tennessee Rivers Railroad Company came on in May, 1867; long before which time, Georgia in December, 1866, and Alabama early in February, 1867, had ratified the consolidation, and authorized the adoption of the name, "The Selma, Rome and Dalton Railroad Company," and the charter, with all its amendments, of the Alabama and Tennessee Rivers Railroad Company.

Hereupon, according to the theory of an *ad-interim* administration, there would have been a bad state of affairs. The ratification being accomplished, and a name given, the original companies, by virtue of their own act, would all be dissolved, and become extinct. Yet, they would also, before dying, have pre-arranged that their successor should not come into being until some months after their decease, when the next annual meeting of the stockholders of one of the dissolved companies, if then existing, should regularly be held. Was it their intention to leave their immense property without any owner in the meantime?

The intelligent president and directors of these railroad companies, and their counsellors, did not intend to, and did not, enter into any such agreement of consolidation as this. They had committed the conduct to completion of their great enterprise to the corporation which had constructed, and was in possession of the 135 miles of railroad then built, and nearly all of the other property at that time acquired or available. They had done all they supposed they could do, towards confirming its authority and giving efficiency to its operations, as the consolidated company; and understanding that the stockholders of the two other companies were now, or, upon ratification by the legislatures, would be stockholders of the Alabama company, which was then also to receive a less unwieldy and more suitable name, but agreeing not to interfere with the action of its elected officers, during its current business year, they took care to provide, by article 7, that "at the *next annual meeting*" of the stockholders of this company, "The Alabama and Tennessee Rivers Railroad Company," the community of interests and rights which the stockholders of all the companies had therein should be recognized, by their being assembled together to participate in the proceedings of, and vote all alike and equally as, the stockholders of this company. Regarding it as the consolidated company, and that, by reason of its being so, the members of all the constituent companies were equally its members and corporators, nothing could be more natural than the

provision made by this article. There is, then, nothing "confused or confusing" about it. It becomes so, only when applied to a theory different from that in compliance with which it was adopted.

The 8th article is as follows : "Each of the parties to this contract and agreement shall ask of the legislatures of their respective States the enactment of a law, *giving one name to all of said companies hereby consolidated* under authority from each of said States." · The entire object of this article, and a whole article is devoted to it, is to obtain a *name* given by laws of both the States, that should be significant of the union of the three companies. They evidently did not want to be called "The Alabama and Tennessee Rivers Railroad Company." They were intent on having what, in the 10th article, is twice called "a common name," and in this article "one name to all of said companies hereby consolidated." And that finally adopted embraces the names of the three towns or cities which were, severally, the seats or homes of the three constituent companies—Selma, Rome, and Dalton. They do not in this, or any other article, provide, or say any thing about obtaining a *charter of incorporation* for the consolidated company. Why is this ?

A charter is necessary to the *creation* of a *new* corporation ; and the charter of a railroad corporation grants franchises of two kinds. The first object and office of such an instrument is to confer on natural persons the capacity and privilege, as individual shareholders or corporators, of being associated together, and constituted into one· organism, a body politic, whereby they may coöperate in accomplishing the objects for which it is created, without individual liability for its acts or contracts, and with power of succession in the membership. To this end, such charters, ordinarily, prescribe their rights, responsibilities and powers as corporators ; the shares into which the capital, if it be a business corporation, shall be divided ; how the *company* shall be organized ; what number of directors, trustees, managers, or other officers they shall have ; how these shall be appointed or elected ; what portion of the authority and powers of the corporation they shall be invested with, and in what manner it shall be exercised. We speak now of things pertaining to the interior action and structural organization of the corporation, by which it becomes in law a capable artificial person. This artificial person, as such, is enabled to own and dispose of property, and transact business ; and if it be a railroad corporation, important rights, privileges and franchises are granted to it, which belong to it in its corporate character, not to the corporators composing it. Thus, the State, in the exertion of its right of

eminent domain, authorizes it to build, own, and operate a railroad through a prescribed part of its territory, or between particular places; to acquire therefor a right of way, according to law, over the lands of citizens and private persons, against their will; and to exact and take tolls and fares for transportation of persons and property; and these rights and franchises, like the visible property belonging to it as a corporation, being separable from its personality, and transferable, may, by consent of the State, be united and consolidated with the like rights, franchises, and property of another railroad corporation, so that those of both, or of more than two, shall become vested in a single one. And that is what was done in this case, by authority of Georgia and Alabama.

But there might be such irreconcilable differences or incongruity in those provisions of their several charters which relate to the rights and liabilities of the corporators themselves, respecting the manner of their being organized, their rights as voters, the numbers, modes of appointing, and extent of the powers of their officers,—things relating to their organization, or conditions upon which their incorporation was made to depend,—as that the inclusion or consolidation of those of each of the charters into one, for a single new consolidated company, would make the corporate body thereby created so misshapen and helpless as to be wholly incapable of the functions it was designed to perform. Things directly inconsistent might become essential parts of the same constitutional instrument.

Take one instance for illustration; (and in some other respects the charters of these companies were unlike). Under the charter of the Alabama company, individual corporators were not made liable for the debts of the corporation, beyond the amount of the unpaid portions of their shares of the capital stock. In one of the Georgia charters, is this section : "The private property of each stockholder shall be liable for the payment of the debts of the company, in proportion to the amount of stock owned ;" a clause under which stockholders who had promptly paid the amounts of their several subscriptions, might, if the undertaking failed, be compelled to pay three, five, or ten times more, according to the condition and involvement of the company at the time of failure. It is not necessary to enlarge on the consequences of forming a company with such an impracticable constitution. We can not suppose that they were not apparent to the presidents, directors, and legal advisers of the parties to the agreement of consolidation; and if, as is contended, a *new* corporation was intended to be and was created by that act, one which had no previous existence, then, since to create it a corpora-

tion, it must have a charter which, in such a case as this, no other being provided, must consist of those of the three constituent companies with all their contrariant provisions united into one, the parties concerned would never have contented themselves with engaging, by article 8, to procure only *a name* and nothing else for their new corporation. They would have been earnest to obtain a new charter for it also. And why were they not? Certainly, because they thought their intention sufficiently declared in previous articles, that the consolidated property, powers and franchises of the three, were to be exercised by and vested in a living company that then was, and long before had been, organized and in operation, under a charter with which they were entirely satisfied, except the name it gave. And they justly thought that the new name desired should be prescribed and recognized in the laws of both of the States in which the railroad was to be built, and by which severally the rights and franchises to be exercised had been granted to corporations differently designated.

Article 10 runs thus: " *Until a common name* shall be lawfully given, under which the franchises of each of said companies shall be united, the Alabama and Tennessee Rivers Railroad Company shall be the acting and controlling company ; and the *organization of the other companies* may be continued until then, for the purpose only of preserving and enabling the acting and controlling company to *exercise the franchises hereby consolidated or united with the franchises of said acting and controlling company*; and all the contracts and obligations which may be entered into or made for said consolidated company, shall be done, *until a common name* shall be lawfully given as aforesaid, *in the name* and in accordance with the franchises of the Alabama and Tennessee Rivers Railroad Company."

This article is so vaguely worded as to afford apparently some support for the theory, derived from the word "until," of an *ad-interim* administration. The chief purpose, though, of the article, seems to have been, by further assurances, to create confidence in and confirm the authority of the Alabama and Tennessee Rivers Railroad Company to exercise all the rights and powers previously belonging to each of the companies separately ; and as provision had been made by article 8 for a change of its name by statutes,—doubtless, the same by which it was expected that its new authority and powers would be ratified—it was apparently thought proper to declare expressly that, " *until*" *this was done*, all that this company, "the acting and controlling company," might do, in the prosecution of the common enterprise, *in its own origi-*

*nal name*, should be as binding and valid, as if done afterwards, in the new name to be given. And in support, to that time, of this authority, " the organization of the *other* companies," was to be continued, " for the purpose *only* of preserving and enabling the acting and controlling company to *exercise* the franchises hereby consolidated or united *with* the franchises of said acting and controlling company." It is plainly indicated that this acting and controlling company, *with* whose franchises those of the others were thereby consolidated, was expected to survive those others; and that the franchises of which they were now deprived, were to be preserved and perpetuated as portions of its faculties, rights and powers.

The word *" acting*," in the connection in which it is used above, does not signify, as argued, that this company was to be the " agent " merely, and for a time, of the other companies. An agent is not, in reference to his principals, the " controlling " person, but the reverse. " Acting " is used in the sense of *operating.* This was the operating and controlling company.

Nor does the consolidation of the franchises of the other companies " *with* " its franchises, as expressed in this article, mean, as in many instances it might, no more than a consolidation of its franchises with theirs—that is, simply a union of all, as insisted on. The language and context plainly import that the Georgia companies were so divested of their rights and powers, as to leave no reason why they should be any longer continued in existence; while, evidently, it was intended that the Alabama company should possess both theirs and its own, and " exercise " them, too, in causing "the railroad which [was then] completed from Selma to Blue Mountain, to be extended and completed from Blue Mountain, by way of Rome, to Dalton." This office and work, devolved on it by the 4th article of the contract of consolidation, are not transferred to any other company. Nor were the franchises which were "consolidated with" its franchises, to enable it to perform the functions of the consolidated company, separated therefrom, to be disposed of otherwise, or its authority or powers in the least impaired, by any thing in the 10th or any other article of that contract.

In fine, while it appears that all the consolidated rights, property and franchises of the constituent corporations, were united in the Alabama company, with the intent that it should employ and exercise them in execution of the purposes for which they were conferred, and that the stockholders of the other companies should become stockholders in it, and those companies be dissolved; it is also clear that no new corpo-

ration was created, or sought to be created, by the contract we have examined, to take the place of the Alabama and Tennessee Rivers Railroad Company, as the consolidated company. If, says the Supreme Court of the United States, "there be no words of grant of corporate powers, it is difficult to see how a new corporation is created. If it is, it must be by implication; and it is an unbending rule, that a grant of corporate existence is never implied."--*Central Railroad v. Georgia*, 92 U. S. 670. Many franchises may be, and are granted, by charters that do not incorporate the grantees. They are not charters of incorporation.

6. We have now reviewed all the articles in the contract of consolidation deemed material in this discussion. The companies being authorized by law " to unite and consolidate their roads, stocks and franchises, . . . on such terms, and to such extent " as they might agree upon, and having entered into and adopted the agreement we have been considering; what did the legislatures of the two States then do? They enacted (the State of Georgia first), " that the consolidation of " the two Georgia companies, designating them by their full names, " *with* the Alabama and Tennessee Rivers Railroad Company of the State of Alabama, so as to form one consolidated railroad company for the *construction and use* of a railroad to be constructed from Blue Mountain, in the State of Alabama, as a *continuation* of the Alabama and Tennessee Rivers Railroad, by way of Rome, to Dalton, in the State of Georgia " [using substantially the language of the 4th article of the contract], " be, and the same is hereby, ratified and approved; and the consolidated company, *acting by its board of directors*, shall be, and is hereby, authorized and empowered to adopt the corporate name and style of the Selma, Rome, and Dalton Railroad Company, and to adopt as its charter the charter of the said Alabama and Tennessee Rivers Railroad Company, as now existing, with all the amendments thereto." The latter provision was probably deemed especially proper in the act of Georgia, as a declaration of her express consent that franchises granted by that State to companies of her own might be vested in and enjoyed by a company incorporated and organized under statutes of Alabama.

What, then, was ratified? "The consolidation of" the Georgia companies *with* the·Alabama and Tennessee Rivers Railroad Company, in the language of the statute of this State, " as agreed on by and between said companies." Observe, also, that it is " *the board of directors* " of the consolidated company, to whom authority is given to adopt the name mentioned and the charter of the Alabama company.

This means, of course, a consolidated company already exist-ing and organized; for none other could have a board of direc-tors. But no *new* corporation had been brought into exist-ence. Is it supposed that a board of directors was to be self-created, and then to adopt a name and charter for, and after-wards to build up, under itself, a corporation which must exist before it could have, or the persons so acting could be its board of directors? Certainly no other company could have been thus referred to, in this grant of authority to adopt a name and charter, but the Alabama and Tennessee Rivers Railroad Company. And very probably, if we had the min-utes of the proceedings of its board of directors of that day, it would be found, that, almost immediately after the passage of these laws, that board formally discarded the old name of the company, and adopted the title, "The Selma, Rome, and Dalton Railroad Company," before the convention of its stockholders in that year's "*annual* meeting," and that the company went right on transacting business as before, with-out any other than this nominal change.

The adoption of a new name, a circumstance not uncom-mon, did not, of course, abolish the corporation; and "the gift of new powers to a corporation," says the Supreme Court of the United States, "has never been thought to destroy its identity, much less to change it into a new being. Such a gift is not a grant of corporate existence. It assumes cor-porate life already existing."—*Central R. R. Co. v. Georgia, supra.* Uunquestionably this is true in the present instance.

However a consolidation of one corporation with another may affect prior executory contracts, and absolve a stock-holder of either from obligation to continue that relation, or a guarantor of stock, or a person who had agreed to lend money for its bonds, from his contract, upon the principle of the plea, *non veni in hanc conventionem*—that he did not engage to do what is now required of him; such decisions do not touch the case and questions now presented. And if, in rela-tion to an existing railroad corporation of one State, with whose franchises those granted by another State to other companies have been consolidated, the ratifying statutes, intended to be identical, of the two consenting States, in con-ferring upon it, "through its board of directors," authority to adopt a designated name, go on further to say, "and to adopt, as its charter, the charter" it had already received from the State which created it; this may be considered as a grant of authority to such company, or requirement of it, by both States concurrently, to proceed in the exercise of its enlarged powers under the charter of its incorporation. True, the pro-vision may have been unnecessary, and the enactments be

inexpertly framed. But we can not give to them any other reasonable interpretation, than that they ratify and validate an agreement that the Alabama company shall possess and exercise the combined franchises of the three companies, "for the construction and use" of a railroad, as a continuation of" that of the Alabama company, " by way of Rome, to Dalton in the State of Georgia."

This conclusion is confirmed by other circumstances. The proceedings to consolidate were in progress, from near the beginning, to the end of the year 1866. After the negotiations of Lapsley with the Georgia companies, the acts authorizing the consolidation were passed; and later still, in May of the same year, " the Breed contract" was entered into. By it, Mr. A. D. Breed took upon himself the burden and expense of extending and completing the railroad from Blue Mountain, to which place it had then been built, about one hundred miles further, to Dalton, in Georgia; he agreeing to do so with no other security than that to be afforded by the road itself, and its appurtenances, and the lands and other property of the Alabama and Tennessee Rivers Railroad Company, indebted as it was. And that contract, as shown in our former opinion, was expressly based on the expectation, that " the chartered rights and privileges"—nothing else was wanted—of the Georgia companies, would " be transferred to, and vested in " the Alabama company ; one of them having signified to it "a perfect willingness to enter into any arrangement" it desired, " for a consolidated and continuous line of railway from Selma to Dalton, *under the ownership and control* of the party of the first part," the Alabama company ; and pursuing that purpose, in the preamble to the *contract of consolidation*, the object of the three companies is declared to be, " to unite together into one company, so as to complete and own and use one continuous railroad, from Selma, by way of Rome, to Dalton, under the authority and control of one set of officers ;" an object which the 4th article particularly, and the 7th, were designed to accomplish.

Of the debts of the Alabama company, no fear was then entertained. The completed road and its other property, it was believed, would be worth more than those debts and the future cost would amount to. The contract with Mr. Breed proves this, by other than the 11th article. For undertaking, as before mentioned, to extend and complete the railroad to Dalton, without any other security for reimbursement of the great expense than liens upon the road, and other property and franchises of the company, he expressly agreed that those liens should be " subject and subordinate to existing liens, and to liens which *may be created* for the security of

bonds of the party of the first part," the Alabama and Tennessee Rivers Railroad Company, " which may be hereafter issued in extinguishment of present mortgage-bonds, . . . or to discharge any debt having a lien on property of " the company. And when this contract was confirmed, in September, 1867, it having been agreed that mortgage-bonds to the amount of $5,000,000, and the mortgage to secure them, under which the complainants make claim, should be executed, bearing date the first day of the following month (October, 1867), to aid Mr. Breed in his undertaking ; it was further stipulated between him and the company, then called the Selma, Rome, and Dalton Railroad Company, that the lien thereby created upon every thing it then had, or should afterwards acquire, its road and appurtenances, its lands, its franchises, and every thing else it could mortgage, should have priority of his liens under the contract of May, 1866. And it being doubtful whether, according to that contract, any of the proceeds of those bonds could be used in extinguishing debts not secured by, or creating liens, it was then, in September, 1867, covenanted that, out of the proceeds of $2,000,000 of those bonds, set apart to secure payment of antecedent debts, the company might pay debts *not* secured by liens, as well as those that were so secured. And notice of the existence of debts of the company, and of the liability of its property to pay them, was carefully embodied in the trust deed of October, 1867, to complainants.

7. The more thorough investigation we have now made, in consideration of the large interests involved, and the ability and earnestness with which the views we heretofore expressed on this question have been controverted, only confirms us in the conclusion we then pronounced, that the Selma, Rome, and Dalton Railroad Company is the Alabama and Tennessee Rivers Railroad Company, under a new name. This identity could not be affected by any deeds executed, or other transactions engaged in, by the board of directors, or any other officers of the company, in September, 1867, or at any other time, founded on the assumption, or indicating an opinion, that the company for which they were acting was a new corporation. The chancellor's decision upon this point will, therefore, be reversed.

8. In respect of the liability of the railroad and its appurtenances from Selma to the State line of Georgia, including the rolling-stock of the company, to the mortgage trust deed of 1852, of which appellant Meyer is now trustee, we adhere to the views expressed in the opinions delivered upon the hearing and application for a re-hearing, upon the former appeal. It is not necessary that we should discuss that ques-

tion further. The ruling of the chancellor will be modified accordingly, so as to declare the property indicated, to the extent mentioned, subject to the lien of that trust deed.

9. Nor is our opinion changed in regard to the claim made for the beneficiaries of that deed,—that it covers the portions of the public lands which were granted by Congress to the State of Alabama, and by the State, in 1858, to the company, in trust to be used as specified, to aid building the railroad. Not only were those lands not within the scope and operation of that trust deed of 1852, but the specific trusts upon which the grant was made would have prevented them from becoming subject to the deed. So much of the chancellor's decree as relates to this matter is not erroneous.

10. The cars and locomotives called "the Breed rolling-stock," were purchased or manufactured by Mr. Breed, and used by him on the railroad while it was in his possession under the lease to him embodied in "the Breed contract;" and we do not think the title to them had passed to the railroad company, when, in August, or September, 1870, he transferred them to the New York Guaranty and Indemnity Company. It was a provision of the Breed contract, that when Mr. Breed should return the railroad and other property received by him under the lease, a schedule should be made of the items and their appraised values, to be compared with the same as set forth in the similar schedule made when he received the property; and it was further agreed that, "in the second schedule, all property that *may* be returned, of *like kind* with that leased and set forth in the first schedule, will be listed and valued;" and the difference between the amounts of these values, if against the railroad company, was to be settled, as a part of its debt to Mr. Breed, by the delivery to him of securities of a kind specified in the contract. Mr. Breed was, also, according to the same instrument, entitled to keep and use the railroad and its appurtenances, and appropriate its revenues to the payment of its debt to him, until it was reduced to $500,000; which reduction was never made. The company owed him about $4,000,000, when, in the autumn of 1870, he turned over to it, and surrendered his right to keep and operate, the completed road; and before doing so, he expressly reserved, with the consent of the company, his title to this new rolling-stock, and they agreed to hire it from him, with a knowledge that he intended to transfer his interest in it to the guaranty company for the repayment of money it had advanced to aid him. The railroad company, also, afterwards hired this stock from the guaranty company, agreeing at the same time to buy it from that company, on terms which it never complied with. The

[Meyer v. Johnston & Stewart.]

conditions, therefore, never existed, upon which title to this rolling-stock was to be vested in the railroad company, and the property to become subject to the mortgage trust deed of 1852. The chancellor's order, overruling the contrary finding of the register, was correct, and is affirmed.

11. The payments made by authority of the chancellor, to an amount between $8,000 and $9,000, to other railroad companies, of moneys due to and previously received for them, according to a necessary usage in the business of connecting railroads, was approved by this court on the former appeal. "To withhold the payment of these moneys," it was then said, "from the corporations for which they were collected, would have been a breach of trust; and probably it would have been resented, by the refusal of those companies to keep up business relations with the defendant company, or the receivers; without which relations, the business and receipts from the road would have been greatly diminished;" and in support of our approval we cited a ruling of Mr. Justice BRADLEY, on the circuit, in *Cowdrey v. Galveston R. R. Co.*, 2 Woods, which allowed a rebate of freights for the purpose of obtaining custom. It may be, as contended, that the authority is not directly in point. But we think the principle upon which it was founded, is applicable in this case. It was manifestly important to the economical management of the railroad, with a view to *preserve* its value, and *prevent the loss* of its business, that good faith should be kept, in a trust of this kind, with those companies, by and over whose roads passengers and goods were transmitted to and from this railroad. The chancellor's ruling on this point is, therefore, again approved.